### FARMERS' LOAN & TRUST CO. et al. v. UNITED STATES.

No. 44—186.

District Court, S. D. New York.

July 13, 1932.

Taylor, Blanc, Capron & Marsh, of New York City (Walter E. Cooper, of New York City, of counsel), for petitioners.

George Z. Medalie, United States Atty., of New York City (Ralph E. Stone, of Mt. Kisco, N. Y., of counsel), for defendant.

PATTERSON, District Judge.

Suit is brought by the executors of the estate of a decedent to recover the estate tax paid to the United States under the provisions of the Revenue Act of 1918 (40 Stat. 1057). The sum of $2,065.76 was paid by the executors under protest, and a claim for refund disallowed. It is the position of the executors that the decedent, Edward A. Morrison, Jr., was a resident of the United States and that an exemption of $50,000, allowable to residents but not to nonresidents, was therefore deductible; further, that they were entitled to a deduction in the amount of $130,217, representing the value of certain securities claimed to have been acquired by the decedent in exchange for property received from the estate of his father who died less than five years before the decedent's death, such property having been included for taxation in the prior estate. If these two points are sound, the deductions exceed the value of the taxable estate, and the executors are entitled to recover the full amount paid.

1. I am satisfied that the decedent was a resident of the United States at the time of his death, September 10, 1921, and that the estate is entitled to the $50,000 exemption. The decedent was born in New York City and lived here or in nearby suburbs until 1909. He was married in 1900, had two children born here, and owned a house at Ardsley-on-Hudson for some time. In 1909 he failed in business and went abroad with his wife and children. For the ten years following he and his family remained in England, occupying in succession several furnished houses in Oxford and the vicinity on short leases. In 1919 they returned to the United States. The children were placed in schools here. The decedent and his wife lived at a hotel in Bronxville until the spring of 1921, except for a summer vacation spent in Connecticut. In April, 1921, he returned to England with his family, where he again took a furnished house. In the late summer his wife and children came back here. The decedent was to follow them but remained in England for medical treatment. He died there September 10, 1921.

Several other matters shed light on the decedent's status. From 1909 on he had no business. He had an interest in some real estate in New York City, but his chief support came from an allowance from his father, Edward A. Morrison, Sr., who lived here and who died August 28, 1919. The decedent received a substantial share of his father's estate, paid over to him in 1919 and 1920. Practically all his property, consisting of cash, securities, clothing, and furniture, was in the United States at the time of his death. He had maintained membership in the Union League Club in New York continuously until his death. In his will, executed in March, 1921, he described himself as a resident of Westchester county, N. Y., and his will was probated there.

The residence referred to in the statute imposing the estate tax is synonymous with domicile. See Bowring v. Bowers (C. C. A.) 24 F.(2d) 918, 921; Matter of Martin's Estate, 173 App. Div. 1, 3, 158 N. Y. S. 915. Something more than mere presence or sojourn at a place is connoted. The search is to determine the place where the decedent had his home, and an important, if not indispensable, factor is the intent of the decedent—facto et animo as the older cases dealing with domicile put it.

It is quite likely that when the decedent took up living in England in 1909, he did so with the idea of having his residence there. He kept no home in this country and had no business here. His remaining in England for ten years gives an element of permanence to his presence there. To be sure, there are tokens of an intention not to sever all ties here—his club membership, the furniture in storage, and other incidents. But the houses in England which he occupied with his family were the only home he maintained, and over the ten-year period from 1909 to 1919 he never came back to this country. I am persuaded that during this part of his life the decedent was a non-

resident of the United States. He belonged to that class which for one reason or another prefers life abroad to life here.

But I am convinced that upon his return here in 1919 he relinquished his English residence and became once more a resident of the United States. The placing of his children in schools here, the remaining here for two years, above all his recital of his residence in his will, are indicative of a residence here. The fact that while here he lived in a hotel instead of in a house or apartment is of no great significance in an age when thousands stay on in hotels year after year and unquestionably consider them as residences. The decedent certainly had no home at any other place. This residence was not interrupted by the final trip abroad in 1921. The weight of evidence is that this was to be only a matter of months and that, but for his illness, the decedent would have returned when his wife and children did. The taking of a ten-year lease on a house in England was not established.

Upon the whole case I am convinced that the decedent was a resident of the United States at the time of his death and that the executors should have been granted the $50,000 exemption.

■ 2. The other question is whether an adequate deduction was allowed by the taxing officers to represent property acquired by the decedent from the estate of his father, who died within five years prior to the decedent's death and whose estate was taxed.

The 1918 Revenue Act, in section 403, permitted the deduction of "(a) * * * (2) An amount equal to the value at the time of the decedent's death of any property, real, personal, or mixed, which can be identified as having been received by the decedent as a share in the estate of any person who died within five years prior to the death of the decedent, or which can be identified as having been acquired by the decedent in exchange for property so received, if an estate tax under the Revenue Act of 1917 or under this Act was collected from such estate, and if such property is included in the decedent's gross estate."

The decedent's father had died on August 28, 1919, leaving a large estate. The decedent's share of this estate exceeded $400,000, and by the time of his death he had actually received in cash and securities about $380,000, all of which had previously been included in the father's estate as subject to the estate tax under the 1918 Act. Some of the securities so received the decedent had retained until his death in 1921. Others he had sold. He had purchased numerous securities in the interim. In making up the estate tax return, the executors claimed as a deduction practically all the securities owned by the decedent at the time of his death, in part as the identical property received by him from an estate taxed within five years, and in part as property acquired in exchange for property so received. The Commissioner of Internal Revenue allowed the deduction as to the securities received by the decedent from his father's estate and still owned by him at his death, but disallowed it as to the "exchanged" securities. The question is whether these latter securities or any of them have been "identified as having been acquired by the decedent in exchange" for property received from his father's estate.

The only securities sought to be identified at the trial of this case are those bought for the decedent by Oliphant & Co., stockbrokers. The proof shows that from December, 1920, to March, 1921, the decedent would from time to time deliver to Oliphant, to be sold for his account, bonds and stocks received by him from his father's estate; that Oliphant would accordingly sell and promptly turn over the net proceeds of sale to the decedent who would deposit the money in his bank account with the Farmers' Loan & Trust Company; that the decedent would also order Oliphant to buy securities for his account, would pay for them promptly in each instance by checks drawn against this bank account, and would pick up the securities. The transcript of the bank account showed that, in addition to the deposits of the proceeds of sales, very substantial sums from unidentified sources had been deposited in it by the decedent, and also that substantial sums had been withdrawn from it for purposes other than the purchase of the new securities.

The same question upon facts substantially similar to these facts, was present in Rodenbough v. United States, 25 F.(2d) 13, 57 A. L. R. 1091, decided by the Circuit Court of Appeals for the Third Circuit. It was there held that the deduction as to "exchanged" property in section 403 is not limited to instances where property is bartered, but extends also to the exchange of one property for another through the medium of money, that is, the purchase of a property with the proceeds of sale of the property first received. It was also held that the burden of proving identity is on the taxpayer.

Passing to the facts of the case, which as here showed a bank account as the general reservoir into which proceeds of sale of inherited securities were poured along with funds from other sources and from which were drawn moneys for the purchase of new securities as well as moneys for other purposes, the court observed that, in the absence of special conditions, there could be no tracing of the inherited property into the new securities except in cases where the amounts withdrawn for such investment were too large to have been supplied wholly from moneys derived from the noninherited sources. The effect of this rule is to charge the sums taken out for purchase of new securities against the miscellaneous deposits primarily, and to charge the sums taken out for other purposes against the deposits derived from inherited property; it is only when the deposits from miscellaneous sources do not suffice to supply the moneys withdrawn to purchase the new securities that an identification between the inherited property and the securities purchased can be established.

Under the rule of the Rodenbough Case, none of the securities purchased through Oliphant & Co. prior to January 12, 1921, can be said to have been acquired in exchange for inherited securities. There were at all times in this period sufficient sums from unidentified deposits to furnish the funds used to buy the new securities. But on January 18, 1921, $876.19 of the $2,046.35 used to purchase $2,000 General Electric bonds must have come from the proceeds of sale of inherited securities; and the same is true as to the entire amounts used to purchase 80 shares of Allied Chemical preferred and $5,000 Standard Oil bonds at about the same time. Again on March 22, 1921, there came a time when part of the moneys reinvested must have come from the proceeds of the securities received from the father's estate. Of the sum of $8,345.28 withdrawn to purchase $10,000 American Telegraph & Telephone bonds, $1,537.57 must have been from inherited funds, and accordingly a pro rata amount of the value of those bonds on the date of the decedent's death (apparently about $1,560) was deductible. The total amounts used to buy $1,000 United States Steel 5s and $2,000 Louisville & Nashville 4s were likewise from inherited property, and the value of these securities at the date of death was a proper deduction. (The value of the $1,000 United States Steel bond was actually allowed as a deductible item by the commissioner and cannot of course be taken again). Except as just indicated, however, the executors have not succeeded in identifying the securities purchased as "having been acquired by the decedent in exchange for property" received from his father's estate.

The executors have submitted analyses of the purchased securities on two alternative theories. The first analysis treats all the securities bought through Oliphant & Co. as coming from the inherited securities sold through the same concern. This ignores the fact that the brokers never retained the proceeds of sale, but always remitted them immediately to the decedent who then mingled them with other moneys. This analysis must accordingly be rejected. The second analysis takes the bank account into consideration and treats all withdrawals, those for the purchase of new securities and those for other purposes, as coming proportionately from the deposited proceeds of sale and from unidentified deposits. This is a more plausible treatment of the matter but must be rejected as contrary to the law laid down in the Rodenbough Case.

There will be judgment in favor of the executors for the amount overpaid, on the basis that they should have been given the benefit of the $50,000 exemption applicable to the estate of a resident decedent, and also that they were entitled to a deduction of the value at the time of death of the securities which I have held in this opinion to have been identified as acquired by the decedent in exchange for securities received from his father's estate. In case counsel cannot agree upon the amount of the overpayment along the lines indicated, the matter may be brought before me on two days' notice.