## CITY BANK FARMERS' TRUST CO. v. BOWERS.

### No. 61.

Circuit Court of Appeals, Second Circuit.

Jan. 8, 1934.

Winthrop, Stimson, Putnam & Roberts, of New York City (William C. Chanler, Henry Steitz, and John E. Parsons, all of New York City, of counsel), for plaintiff.

Thomas E. Dewey, U. S. Atty., of New York City (Frank Chambers, Asst. U. S. Atty., of New York City, of counsel), for defendant.

Before MANTON, L. HAND, and CHASE, Circuit Judges.

L. HAND, Circuit Judge.

This is an action against a collector of internal revenue to recover estate taxes erroneously collected, tried upon stipulated facts before a judge, who gave judgment for the plaintiff for part of the amount claimed. The facts are as follows: The plaintiff's testatrix, Voronoff, was a citizen and resident of France who died in Paris in March, 1921. She had property real and personal both in the United States and elsewhere, of about $4,270,000, of which $435,000 was outside the United States; her total debts and administration expenses were somewhat over $1,000,000. Securities amounting to $1,049,-000, pledged with a bank (the plaintiff), in the sum of $557,000, were among the American assets. In assessing the estate tax the commissioner included in the gross estate the total value of the pledged securities, instead of only the surplus after deducting the loans; and in allowing deductions, he followed section 403 (b) (1) of the Act of 1918 (40 Stat. 1098), which in the case of a non-resident limited allowable deductions to 10 per cent. of the gross estate. The plaintiff paid the tax as assessed, and sued to recover the excess over a tax computed, first, by excluding from the gross estate the amount of the loans secured by the pledge; and, second, by allowing as deduction that share of the debts which the American assets bore to the gross estate both here and abroad. Its position is that the limit fixed by section 403 (b) (1) was unconstitutional; and that section 402 (a) meant to include only the surplus of the pledge in the gross estate. The judge ruled with the plaintiff on the first point, and against it on the second and both sides appealed.

■ The more troublesome question is the first, for the section undoubtedly fixed a standard, altogether unfair and unreasonable in its incidence, as Congress itself recognized in 1928. Section 401 (a) of the Act of 1928, 26 USCA § 1095 (a). Its unconstitutionality does not, however, inevitably follow. The argument is in two parts: First, that to ignore the decedent's debts in computing an estate tax is to levy a direct tax, not an excise, and is unconstitutional for that reason (section 9, art. 1); second, that even if the tax be an excise, the resulting inequality violates the Fifth Amendment. As to the first, the theory is that creditors do not succeed to the decedent's property by his death; they could collect before and they may equally collect thereafter; death is not the "generative source" of their right. Therefore, a succession tax based upon the gross estate, or indeed upon any part of the property which is required to pay creditors, is not a succession tax at all. Even so, it might be possible to defend the greater part of the tax at bar; for when a nonresident owns property outside the United States, Congress might perhaps require the executor to marshal the indebtedness first against the foreign assets, treating the property within the United States so relieved as passing by death. However, this would not here be enough, because the foreign assets would not pay the debts and other charges; and the larger question must be answered.

The argument proceeds that, since no excise may be levied upon the property which passes to creditors, the calculation of the succession tax upon what passes to legatees must not include property allocable to creditors, either in the base or in the determination of the rate. Frick v. Pennsylvania, 268 U. S. 473, 45 S. Ct. 603, 69 L. Ed. 1058, 42 A. L. R. 316, is said so to hold. In that

case the state tried to defend a succession tax levied on all the property of a resident inside and outside the state, on the theory that it might levy a tax upon the succession to the property within the state, calculated as though all the property was within it. But the court said no, because that would indirectly tax the property outside, though in Maxwell v. Bugbee, 250 U. S. 525, 40 S. Ct. 2, 63 L. Ed. 1124, a state had been allowed to use such property to fix the rate of taxation upon the succession to local property. In both cases the question was only of the Fourteenth Amendment; but Frick v. Pennsylvania, supra, 268 U. S. 473, 45 S. Ct. 603, 69 L. Ed. 1058, 42 A. L. R. 316, certainly did hold that a succession tax upon property within the power of a taxing state may not be computed by including within the base property beyond its power; and it seems to us to make no difference whether in the case of a state the property is beyond its borders, or in the case of the United States the tax is beyond its powers as defined by the Constitution. Thus the question cannot be avoided whether the succession to creditors is a proper subject for an excise. The defendant invokes that part of Frick v. Pennsylvania in which the court allowed the base to include property taken by the United States for its own estate taxes. The court did not say, however, that a tax upon the passage of that property was an excise; that question could not arise, and the case is no authority as to it. Nor do we see that Plummer v. Coler, 178 U. S. 115, 20 S. Ct. 829, 44 L. Ed. 998, is material. The point appears to be res integra.

It is of course true that death does not create the decedent's debts, as it does create the claims of legatees and next of kin. But the debts were the decedent's and he has died; how far they shall constitute claims against another person, his executor or his legatees, is obviously another question; the dead man's promises may bind them, or they may not; that is a question on which the law must speak, and its voice has never been unequivocal. Thus it by no means follows that death may not be an occasion on which to levy an excise. It would be hazardous to attempt a definition of that term; but we think it safe to say that it includes an event or transaction which determines legal relations, Knowlton v. Moore, 178 U. S. 41, 47, 20 S. Ct. 747, 44 L. Ed. 969; or the exercise of a single one of those powers whose aggregate makes up the concept of property, Bromley v. McCaughn, 280 U. S. 124, 50 S. Ct. 46, 74 L. Ed. 226. It will be enough, if the death of the debtor has a substantial legal effect upon the creditor's remedies or rights; if he cannot pursue the same remedies, or any remedies, or get recognition of his right, except through the intervention of the state.

Historically there can be no doubt that death had important results. The notion of a continuation of a dead man's personality came very slowly in the common law; representation was not easily evolved. Even today it is not universal; many duties die with the obligor. In early times the testator had even to direct his executor to pay debts; they were like legacies (II Pollock & Maitland, 341); and while by the end of the Thirteenth Century the action of debt lay against the executor (II Pollock & Maitland 345; III Holdsworth, 578, 579), it was limited to cases where the testator could not wage his law. Assumpsit did not follow till the Sixteenth Century, and very doubtfully even then, until Slade's Case (4 Coke 92 (b) ), in 1602; (III Holdsworth, 451, 452); account was not possible until the Eighteenth Century; (III Holdsworth, 579); and though detinue came earlier, it was a most inadequate remedy. The complete remedies of creditors as we now know them, are the result of a long and tentative series of steps.

If, disregarding history, we look at the present position of creditors, the same thing is true. A dead man cannot be sued; his creditors must wait until his representative is appointed, or must get one appointed on their own motion; and though he may be sued, collection must await the distribution of the estate. All debts must be brought into hotchpot and share ratably. Back of this too lies a long and confused history, resulting in an active intervention of the court. So it seems to us that as matter of constitutional interpretation, it is not true to say that the passage of property to a decedent's representative may not be the occasion of an excise even upon so much of tthe property as must inevitably pass to creditors.

That, however, does not answer the second argument, drawn from the unfair discrimination of a tax reckoned on the gross estate; it may violate the Fifth Amendment, though an excise. We might find too great difficulties, if it were applied to residents; certainly its incidence would be a matter of pure accident; the legatees of a testator who left no debts would pay no more than those of one, most of whose assets were necessary to pay his debts. It is the distributees who feel the pinch of succession taxes,

and it would be hard to find any rational justification for such a distribution of burdens. Moreover, the 10 per cent. allowance does not cure the evil; every decedent leaves some debts, and the limitation merely creates a favored class, leaving the rest to pay a tax upon what by no possibility they can receive. We shall assume arguendo, therefore, that a tax, computed on the gross estate alone, or with a deduction for debts based upon the gross estate, would be invalid if applied to residents. Though section 403 (b) (1), 40 Stat. 1098 touches only nonresidents, the inequality is the same; it is as arbitrary to determine their burdens at the mere sport of accident, as those of residents. Moreover, the Fifth Amendment protects them to some extent at any rate, as it does citizens. Wong Wing v. U. S., 163 U. S. 228, 16 S. Ct. 977, 41 L. Ed. 140; Japanese Immigrant Case, 189 U. S. 86, 23 S. Ct. 611, 47 L. Ed. 721; Russian Volunteer Fleet v. U. S., 282 U. S. 481, 51 S. Ct. 229, 75 L. Ed. 473. But the sanctions which enforce the discrimination are very different in the two cases; a resident, by which we understand one domiciled in the United States (Bowring v. Bowers, 24 F.(2d) 918, 921 (C. C. A. 2); Farmers' L. & T. Co. v. U. S. (D. C.) 60 F.(2d) 618, 619), cannot escape. Not so a nonresident, especially when as here she was an alien as well. She invested in the United States only because better financial opportunities offered; she might take away her funds without disturbance to any other interest; it was not necessary for her to uproot those ties which make up the concept of a home; she might refuse to be unjustly sued with the loss of only a hopeful field for profit. We might agree that had she died before she had a reasonable chance to withdraw, her legatees might complain; this would not avail them, for she kept her property in the United States more than two years after the act of 1918 was passed. Her ability thus to avoid the consequence may not indeed justify the national polity of section 403 (b) (1); but it removes the grievance. Truax v. Raich, 239 U. S. 33, 36 S. Ct. 7, 60 L. Ed. 131, L. R. A. 1916D, 545, Ann. Cas. 1917B, 283, well illustrates the distinction between those cases where an alien may invoke the Fifth or Fourteenth Amendment and those where he may not. The plaintiff was an alien, admitted to the United States under its immigration laws; as such he had an interest, secured by law paramount to that of Arizona. The Fourteenth Amendment protected that interest by forbidding the state to entrench upon it indirectly. An alien, who invests funds in the United States, has indeed an interest also, though a lesser one; but the laws of the United States do not vouchsafe it; so far as it is a right, it must derive from treaty or the like. The United States, if not otherwise bound, may recognize that interest so far as seems wise; it may impose upon it such conditions as it chooses.

From the earliest times aliens have been under disabilities at common law. Originally indeed they could not hold land at all (I Pollock & Maitland, 442; IX Holdsworth, 92); and after this was changed, their land escheated to the king upon their death; it was neither heritable nor descendible. Coke on Littleton, 2 b. n. 3. The same was generally true in the states until changed by statute. Fairfax v. Hunter, 7 Cranch, 603, 621, 3 L. Ed. 453; McCormack v. Coddington, 184 N. Y. 467, 475, 77 N. E. 979; Sands v. Lynham, 27 Grat. (Va.) 291, 297, 21 Am. Rep. 348; II Kent's Comm. 54. For this reason the Supreme Court in 1850 upheld a succession tax levied on land by a state, and limited it to nonresident aliens. Mager v. Grima, 8 How. 490, 12 L. Ed. 1168. It is true that this was before the Fourteenth Amendment, but the reasoning adopted is equally applicable now as then; it was based upon the absolute power of a state to forbid aliens to hold property within its borders, and as a corollary to admit them on what terms it pleased. Furthermore, the question seems to us foreclosed by Burnet v. Brooks, 288 U. S. 378, 53 S. Ct. 457, 77 L. Ed. 844, 86 A. L. R. 747. The Supreme Court had very recently decided that no state might levy a succession tax upon choses in action at the domicile of the obligor. Farmers L. & T. Co. v. Minnesota, 280 U. S. 204, 50 S. Ct. 98, 74 L. Ed. 371; Baldwin v. Missouri, 281 U. S. 586, 50 S. Ct. 436, 74 L. Ed. 1056; Beidler v. South Carolina Tax Commission, 282 U. S. 1, 51 S. Ct. 54, 75 L. Ed. 131. In First National Bank v. Maine, 284 U. S. 312, 52 S. Ct. 174, 76 L. Ed. 313, this had been extended to shares of stock in a local corporation. This, as we read the opinions, was because the situs of such property was the domicile of the obligee; that put it beyond the jurisdiction of the state. Obviously, if this were a doctrine of universal application, it also applied to the United States. But that the court denied; the Fourteenth Amendment forbad the double taxation of citizens, but it did not protect nonresidents, who must rely only upon international arrangements between the United States and their sovereigns; for example, treaties, such as in this very case pro-

tect Frenchmen against discrimination by the states. Article 7 of the French Treaty of 1858 (10 Stat. 996). Thus the United States is not bound in dealing with nonresidents, as are the states, or even the United States, when citizens are concerned. This does not imply one measure of equity for citizens and another for aliens; it recognizes that the interests at stake are different; that the intercourse between nations is matter for international agreement; that, conceding the protection of the Constitution to nonresidents so far as they are admitted, they have only such rights of intercourse as the nation chooses to accord. For these reasons we think that section 403 (b) (1) does not violate the Fifth Amendment.

██ The last question is whether the pledged securities should be excluded from the gross estate up to the amount of the loans. The statute, section 403 (a) (1), plainly meant the opposite; among the deductions allowed were "unpaid mortgages," an impossible item unless the whole value of the mortgaged property is to be included in the gross estate under section 402 (a), 40 Stat. 1097, as an "interest * * * subject to the payment of the charges against his estate." The regulations under the Act of 1918 (article 15, Regulations 37), specifically so provided; and their successors as well. Section 402 (a) was reënacted in 1921 and 1924 without change, though under a different section number; it is most unlikely that a contrary intent should have escaped expression for so long. The interest of a pledgee has indeed somewhat baffled common lawyers, but it is usually said that "title" remains in the pledgor, and that the pledgee has only a "special property"; in New York as elsewhere. Smith v. Savin, 141 N. Y. 315, 326, 36 N. E. 338; Gillet v. Bank of America, 160 N. Y. 549, 560, 55 N. E. 292. When the question here at bar arose under the New York Transfer Tax Law (Consol. Laws N. Y. c. 60, §§ 220–245) the full value of the pledge was included in the estate. In re Hallenbeck's Estate, 231 N. Y. 409, 132 N. E. 131. See, also, Larson v. MacMiller, 56 Utah, 84, 189 P. 579. The pledgee in substance has no more than a power to sell the pledge upon default and to recoup; the rise or fall in value of the pledge is on the pledgor's account; he may redeem it by payment of the debt from any of his assets, and if the pledgee returns it, he may still collect the debt. Moreover, at least in the case of a solvent estate like that at bar, upon the pledgor's death, the pledgee stands in no different position from any other creditor, except that he need

not wait for administration to realize his claim. Debts must be paid before distribution, and the creditors are all secured, for the chances of the decedent's solvency end, unless indeed the property falls in value, a risk which the pledgee also shares as to the pledge. Whether the executor chooses to redeem the pledge or let the pledgee sell it, rests in his choice; no one can say whether or not it will in the end be a part of the net estate. If the executor does redeem it, the payment must be apportioned among all the assets, foreign and domestic; if he does not, the value of the gross estate cannot depend upon his decision. The judge was right in holding that under section 402 (a) the gross estate included the full value of the securities.

Judgment reversed, in so far as it allows recovery of a sum in excess of $1,889.21, with interest from December 31, 1923.