GERRIT B. LEMMEN AND JUDITH K. LEMMEN, PETITIONERS
v. COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket No. 1432–79.     Filed December 23, 1981.

*George W. Harrison III, Robert A. Hudson,* and *Charles D. Miner,* for the petitioners.
*F. Michael Kovach* and *Deborah S. Hack,* for the respondent.

FEATHERSTON, *Judge*: Respondent determined deficiencies in petitioners' Federal income taxes as follows:

| Year | Deficiency |
| --- | --- |
| 1973 | $10,030 |
| 1974 | 19,905 |
| 1975 | 4,369 |

After concessions by both parties, the issues remaining for decision are:

(1) Whether petitioner Gerrit B. Lemmen's investment in polled Hereford cattle during the years in question constituted an activity engaged in for profit, and, if so;

(2) Whether the excess of the purchase price of the cattle

over their fair market value at the time of purchase represents an intangible asset that is not subject to amortization or depreciation.

FINDINGS OF FACT

At the time the petition was filed, petitioners Gerrit B. Lemmen (hereinafter petitioner) and Judith K. Lemmen, husband and wife, were legal residents of Bloomfield Hills, Mich. They filed joint Federal income tax returns for 1973, 1974, and 1975 with the Internal Revenue Service Center, Cincinnati, Ohio.

During the years in question, petitioner was employed fulltime as a lumber broker. In addition, he operated his own wholesale lumber business during 1973, 1974, and 1975. In each of those years, petitioner's income from his employment and business was in excess of $100,000, and he was subject to a marginal Federal income tax rate of at least 50 percent.

In August 1968, Calderone-Curran Ranches, Inc. (CCR), was incorporated under the laws of Michigan, with its principal place of business in Grass Lake, Mich. CCR was engaged in the business of raising and maintaining registered polled Hereford cattle for breeding purposes, both for its own account and for the account of others. It offered the cattle for sale to investors in "managed breeding herds" consisting of 10 female animals each.

CCR offered the herds for sale through the brokerage firm of Manley, Bennett, McDonald & Co. Dale Uhas (Uhas), a "registered representative" employed by that firm, contacted petitioner in early 1973 concerning the possibility of petitioner's investing in a CCR herd.[1] In this connection, Uhas provided petitioner with a prospectus dated October 16, 1972 (the prospectus), and a supplement to the prospectus dated February 20, 1973. Petitioner read both of these documents prior to making any investment in a CCR herd.

Under the prospectus, CCR offered 179 managed breeding herds for sale at a price of $40,000 per herd ($4,000 per animal). Each herd was to be composed of animals ranging from 1 through 4 years in age, but CCR did not "assure that

---

[1]Petitioner had previously done business with Uhas.

the age mix of a particular herd will be comparable to the age mix of each other herd." The selection of particular cattle for each herd was to be made by CCR and was not subject to the approval of individual investors. The prospectus stated that each investor in a herd "may enter into a Maintenance Contract with * * * [CCR] for the care and breeding of the cattle." It further stated as follows:

Purchase of the herds offered hereby is subject to a high degree of risk. * * * Such a purchase is considered suitable primarily by investors in the higher tax brackets because of certain tax benefits available under present provisions of the Internal Revenue Code. * * *

   \*       \*       \*       \*       \*       \*       \*

The herds offered hereby are designed to permit persons with high ordinary taxable income to become breeders of registered purebred Polled Hereford cattle and to build herds through use of * * * [CCR's] management and facilities.

The prospectus discussed in considerable detail the Federal income tax consequences (e.g., investment credit, depreciation, ordinary income versus capital gain) that could result from the purchase of a herd and the subsequent sale of the herd or individual animals from it.[2] By way of example, pro forma investment analyses were set forth in the prospectus[3] with respect to hypothetical herds purchased either for cash[4] or under a deferred payment plan. These analyses, which projected that an initial herd of 10 animals would grow to 66 animals over a 7-year period, showed the annual tax savings that would be generated as a result of the investment credit and the deductions for depreciation and interest payments (under the deferred payment plan) in the case of herds purchased by investors subject to marginal tax rates of 50 percent, 60 percent, or 70 percent. The analyses also showed the annual and cumulative "Investment cost after tax deductions" that

---

[2]The description of tax consequences was based on the assumption "that herd purchasers will be deemed for federal income tax purposes to be engaged in the trade or business of farming (specifically, the holding of cattle for breeding purposes)."

[3]The analyses were "based upon the assumption that the herd owner will be entitled to the most favorable tax treatment presently available under applicable tax laws." The prospectus recommended "that each potential purchaser consult his own tax advisor in order that the effects of the purchase of a herd hereunder may be determined with specific reference to his own tax situation and any changes in the applicable law."

[4]Payment of the full purchase price in cash entitled the purchaser to a discount equal to 7 percent of the purchase price.

would be incurred in the year of purchase and during the following 7-year period.[5]

Petitioner is a cautious investor who appreciates the time-value of money. Prior to being approached by Uhas in connection with the CCR offering, petitioner had heard "a lot of bad things about cattle." Petitioner had no experience in raising or selling cattle.

Uhas has never been a rancher. He does not hold a degree in animal husbandry and, apart from persons who represented CCR, did not consult with anyone holding such a degree at the time he became involved with the CCR offering. Uhas was able to evaluate the cattle-maintenance and breeding programs of CCR only in terms of the credentials of the persons responsible for those programs. However, he was qualified to independently evaluate the office operations and business practices of CCR from a managerial standpoint.

On or about February 11, 1973, Uhas sent to petitioner the schedule on page 1332 detailing the cash outlay and tax benefits that would be involved in purchasing a CCR herd and holding it for 7 years.

In late March 1973, petitioner and Uhas visited the CCR ranching facility in Grass Lake, Mich. They were given an extensive tour of the ranch by Harold Schroeder (Schroeder), an officer of CCR who was primarily in charge of the daily operation of the ranch. Schroeder informed them that CCR produced its own feed and that a very low percentage of its cattle were lost to disease. Petitioner and Uhas were generally impressed with the ranch, which appeared to them to be well organized and maintained.

At some point during the tour of the ranch, Schroeder showed petitioner and Uhas market data compiled by the American Polled Hereford Association with respect to recent and historical sales of cattle similar to those offered for sale in CCR's managed breeding herds.[6] Schroeder stated that the

---

[5]One such analysis, absent the notes containing qualifying assumptions and explanations, is set forth below for illustrative purposes as shown on p. 1330.

[6]The market data shown to petitioner and Uhas at the ranch was not made part of the record. We note that the prospectus contained the following:

"There is a market for individual female purebred Polled Hereford animals. The following table sets forth certain information with respect to sales of female purebred Polled Hereford

## PRO FORMA INVESTMENT ANALYSIS (1 HERD—10 COWS)

### DEFERRED PAYMENT PLAN

#### HERD PURCHASED IN JUNE

Investment cost after tax deductions

| Herd owner's calendar year (1) | Annual cash outlay (2) | Available tax deduction Depreciation (3) | Investment tax credit (4) | 50% Bracket | | | 60% Bracket | | | 70% Bracket | | | Estimated progeny added to herd (14) | Estimated size of herd (15) |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | Annual tax savings (5) | Annual cost (6) | Cumulative cost (7) | Annual tax savings (8) | Annual cost (9) | Cumulative cost (10) | Annual tax savings (11) | Annual cost (12) | Cumulative cost (13) | | |
| 1 | $37,200 | $13,495 | $2,604 | $9,352 | $27,848 | $27,848 | $10,701 | $26,499 | $26,499 | $12,051 | $25,149 | $25,149 | --- | 10 |
| 2 | --- | 6,780 | --- | 3,390 | (3,390) | 24,458 | 4,068 | (4,058) | 22,431 | 4,746 | (4,746) | 20,403 | 2 | 12 |
| 3 | --- | 4,841 | --- | 2,420 | (2,420) | 22,038 | 2,905 | (2,905) | 19,526 | 3,389 | (3,389) | 17,014 | 4 | 16 |
| 4 | --- | 3,456 | --- | 1,728 | (1,728) | 20,310 | 2,073 | (2,073) | 17,453 | 2,419 | (2,419) | 14,595 | 5 | 21 |
| 5 | --- | 2,468 | --- | 1,234 | (1,234) | 19,076 | 1,481 | (1,481) | 15,972 | 1,727 | (1,727) | 12,868 | 7 | 28 |
| 6 | --- | 2,330 | --- | 1,165 | (1,165) | 17,911 | 1,398 | (1,398) | 14,574 | 1,631 | (1,631) | 11,237 | 9 | 37 |
| 7 | --- | 2,330 | --- | 1,165 | (1,165) | 16,746 | 1,398 | (1,398) | 13,176 | 1,631 | (1,631) | 9,606 | 12 | 49 |
| 8 | --- | --- | --- | --- | --- | 16,746 | --- | --- | 13,176 | --- | --- | 9,606 | 17 | 66 |
| | 37,200 | 35,700 | 2,604 | 20,454 | 16,748 | 16,746 | 24,024 | 13,176 | 13,176 | 27,594 | 9,606 | 9,606 | 56 | 66 |

price of such cattle could easily reach $1,000 per head during the ensuing 12-year period. Petitioner further investigated the desirability of investing in a CCR herd by contacting others who had previously done so.

In discussing with petitioner the merits of investing in a CCR herd, Uhas pointed out that the maintenance fee provided for in the maintenance contract offered to the purchaser of a herd was a specified portion of the progeny to be born to the herd. Petitioner and Uhas agreed that this would be beneficial to a purchaser because (1) he would be protected from uncertain maintenance costs in the future, and (2) CCR would have an incentive to properly maintain the herd so as to ensure that high quality progeny would be produced. In addition, Uhas and petitioner felt that there was value to the investor in the "economic size" of CCR and in the fact that CCR had invested substantial amounts to purchase quality bulls for use in its breeding program.

The maintenance contract offered by CCR was for an initial term of 7 years with an option in the herd purchaser to extend the contract for 5 years thereafter. The contract included a commitment by CCR to repurchase the herd and progeny at the end of the 12-year period for prices stated in the contract. CCR projected that, at the end of the 12-year period and after payment of the annual maintenance fee in progeny, the original herd of 10 animals would have increased to 182 animals. Petitioner thought that, even if he took the CCR projection "on a 75 percent basis," the purchase of a herd would be a good investment, considering the repurchase

---

animals at least one year of age at public auctions and otherwise in the United States and Canada, as recorded by the American Polled Hereford Association. The highest reported public auction price ever paid for such an animal was $25,700, in February, 1970."

| Period | Reported sales at public auctions | Approximate range of prices received | Approximate average price received | Total recorded transfers of registered ownership[1] |
|---|---|---|---|---|
| 9/1/70–8/31/71 | 12,645 | $235-$6,500 | $478 | 57,024 |
| 9/1/71–6/30/72 | 8,845 | 265- 5,000 | 537 | 72,121 |

[1] Except for reported sales at public auctions included herein, no representation can be made with respect to the purchase price, if any, received in these transactions.

## PRO FORMA INVESTMENT ANALYSIS

### (1 Herd—10 Cows / Filing Joint Return)

| Year (1) | Cum. mo. pymts. (2) | Annual cash outlay (3) | Available tax deductions Dep. (4a) | Int. (5) | Total (6a) | Inv. tax credit (6b) | 50% Tax bracket An. net tax svgs. (6c) | An. cost after tax svgs. (7) | Cum. cost after tax svgs. (8) | 60% Tax bracket An. net tax svgs. (6d) | An. cost after tax svgs. (9) | Cum. cost after tax svgs. (10) | 70% Tax bracket An. net tax svgs. (6e) | An. cost after tax svgs. (11) | Cum. cost after tax svgs. (12) | Est. size of herd (14) |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 1973 | 8 | $11,100 | $14,286 | $1,467 | $15,753 | $2,800 | $10,677 | $423 | $423 | $12,252 | ($1,152) | ($1,152) | $13,827 | ($2,727) | ($2,727) | 10 |
| 1974 | 20 | 6,600 | 7,347 | 2,077 | 9,424 | --- | 4,712 | (1,112) | (689) | 5,654 | (2,054) | (3,206) | 6,597 | (2,997) | (5,724) | 12 |
| 1975 | 32 | 3,600 | 5,248 | 1,967 | 7,215 | --- | 3,607 | (7) | (696) | 4,329 | (729) | (3,935) | 5,051 | (1,451) | (7,175) | 16 |
| 1976 | 44 | 3,600 | 3,748 | 1,849 | 5,597 | --- | 2,799 | 801 | 105 | 3,358 | 242 | (3,693) | 3,918 | (318) | (7,493) | 21 |
| 1977 | 56 | 4,400 | 2,677 | 1,706 | 4,383 | --- | 2,191 | 2,209 | 2,314 | 2,630 | 1,770 | (1,923) | 3,068 | 1,332 | (6,161) | 38 |
| 1978 | 68 | 6,400 | 2,597 | 1,456 | 4,053 | --- | 2,026 | 4,374 | 6,688 | 2,432 | 3,968 | 2,045 | 2,837 | 3,563 | (2,598) | 37 |
| 1979 | 80 | 12,000 | 2,597 | 954 | 3,551 | --- | 1,776 | 10,224 | 16,912 | 2,131 | 9,869 | 11,914 | 2,485 | 9,515 | 6,917 | 49 |
| 1980 | 84 | 6,894 | 0 | 118 | 118 | --- | 59 | 6,835 | 23,747 | 70 | 6,824 | 18,738 | 82 | 6,812 | 13,729 | 66 |
| | 84 | 51,594 | 38,500 | 11,594 | 50,094 | 2,800 | 27,847 | 23,747 | 23,747 | 32,856 | 18,738 | 18,738 | 37,865 | 13,729 | 13,729 | 66 |

(4a) Computed on the basis of a 7-year life with a salvage value of $150 per animal; 200% declining-balance method used, switching to straight-line when advantageous.

(6a) Total available tax deduction, sum of columns (4a) and (5).

(6b) Net investment tax credit equal to 7% of the purchase price of a herd.

(6c), (6d) & (6e) Purchaser's net tax savings computed by applying the appropriate tax bracket to the tax deductions [col. (6a)] and the tax credit [col. (6b)] in the year of purchase.

NOTE: The above schedule reflects the first monthly payment paid on May 30, 1973, and the herd being purchased in March and April 1973.

commitment and the fact that he was "protected" from maintenance for 12 years.

On April 30, 1973, petitioner purchased a herd of 10 purebred polled Hereford cows (herd No. 1) from CCR for $40,000. This purchase was made pursuant to a deferred-payment plan under which petitioner gave CCR a downpayment of $7,500 and a negotiable promissory note for the balance of $32,500. The note was payable over 7 years in semiannual installments with interest at the rate of 7 percent. Petitioner was personally liable for the repayment of the note; it was not a nonrecourse obligation.

In connection with the purchase of herd No. 1, petitioner on the same day entered into a maintenance contract with CCR. Under the contract, CCR agreed to "care for, supervise, feed and maintain" petitioner's animals and to "provide the necessary bull battery and breed" his animals. CCR further agreed that, during the term of the contract, it would "substitute a comparable purebred Polled Hereford female animal" for any animal in petitioner's herd over 1 year of age and under 11 years of age that died or was, in the opinion of CCR, infertile, or that should, in its opinion, be culled from the herd or destroyed. The contract provided for a maintenance fee to be received by CCR as follows: [7]

3. MAINTENANCE FEE: Calderone-Curran is hereby assigned upon birth (i) all of the Bull Calves born to the HERD and (ii) three of the first nine Heifer Calves, and one of each nine Heifer Calves thereafter, born to the HERD; *provided*, however that Calderone-Curran may be assigned Heifer Calves in any year only to the extent the total number of HERD animals remaining at the end of that year will equal or exceed the corresponding cumulative total set forth in Schedule B.[8] However, if the

---

[7]In the text of the contract, petitioner is referred to as the "Owner" and CCR is referred to as Calderone-Curran or the "Company."

[8]"Schedule B," which contained CCR's projection of the herd growth to be experienced by a herd purchaser over a 7-year period, is as follows:

SCHEDULE B
(to maintenance contract)

| Herd owner's calendar year | Cumulative herd size for purposes of par. 3 of maintenance contract |
|---|---|
| 1 | 10 |
| 2 | 12 |
| 3 | 16 |
| 4 | 21 |

OWNER at any time during the term of this Agreement sells any of the HERD, Schedule B shall be adjusted by Calderone-Curran, in a manner consistent with the method by which it was originally computed, to reflect the adverse effect of such sale upon the number of progeny which may thereafter be produced. The Heifer Calves assigned to Calderone-Curran under this Agreement shall be those which it determines in its sole discretion to have the least desirable breeding characteristics.

The maintenance contract provided for an initial term of 7 years. Under a supplemental agreement between petitioner and CCR, executed on the same day as, and appended to, the maintenance contract, petitioner was given the option to extend the contract for an additional 5 years. During this "Renewal Period," CCR was to receive as its maintenance fee all bull calves and one of every four heifer calves born to petitioner's herd; however, as was the case under the provisions pertaining to the initial 7-year term of the contract, CCR was to receive heifer calves only to the extent that the total number of animals remaining in petitioner's herd would equal or exceed herd-size projections made by CCR.[9] Petitioner was granted the option to pay a cash maintenance fee during the "Renewal Period" in lieu of the progeny maintenance fee set forth in the supplemental agreement.

The supplemental agreement also provided petitioner with an option to require CCR to purchase his entire herd (except for the original 10 animals) for specified prices at the end of the "Renewal Period" if he (1) had exercised his option to

---

| 5. | 28 |
| 6. | 37 |
| 7. | 49 |
| 8. | 66 |

[9]The projections for the "Renewal Period" were set forth in the supplement to the prospectus as follows:

| Herd owner's calendar year | Estimated progeny added to herd | Estimated size of herd |
|---|---|---|
| 9 | 15 | 81 |
| 10 | 22 | 103 |
| 11 | 24 | 127 |
| 12 | 30 | 147 |
| 13 | 35 | 182 |

This table was subject to adjustment by CCR, "in a manner consistent with the method by which it was originally computed, to reflect the adverse effect of any sale by the OWNER of any of the HERD, except as recommended in writing by the Company, prior to or during the five (5) year period included in such table."

extend the maintenance contract through the "Renewal Period" and (2) had not sold any of the original herd or progeny during the initial 7-year term or during the "Renewal Period" of the contract, "except for the sale of infertile or dead animals or animals which * * * CCR has otherwise recommended in writing to be sold." Under this provision, if petitioner were to exercise his option, CCR would be obligated to pay $300 for animals up to 1½ years of age, $600 for animals from 1½ to 5 years of age, and $400 for animals 5 years of age or older; however, CCR was not obligated to pay a total purchase price of more than $80,000 or to purchase less than all of the progeny in the herd. In connection with this provision, the agreement sets forth extended payment terms for the purchase of the herd by CCR.

In elaborating upon the repurchase obligation of CCR contained in the supplemental agreement, the supplement to the prospectus stated in part as follows:

Based upon the assumptions applied in arriving at the pro forma estimate of progeny in the herd owner's 13th calendar year in the table above,[10] the 182 animals projected will consist of 35 animals up to 1½ years old, 91 animals from 1½ to 5 years old and 56 animals over 5 years old, and the 10 animals of the original herd will previously have been recommended for sale by the herd owner. If the Company's estimates are correct with respect to ultimate herd size and composition of the herd, and if open market herd prices at the end of the renewal period are equal to or greater than the Company's per animal repurchase commitment prices, then the owner's herd would be worth $87,500 or more and the Company would immediately benefit to the extent of $7,500 or more if it were required to purchase the herd for the $80,000 maximum guaranty price. There can be no assurance that the breeding experience of an individual herd owner will not vary substantially from the Company's estimates. * * *

The supplement to the prospectus stated that—

In determining whether or not to exercise his option to require the Company to purchase his herd at the end of the renewal period, the herd owner should compare the then cash market value of his herd as against the prices offered by the Company and the then discounted value of the Company's extended payment terms as well as the Company's ability to fulfill its obligation under the terms of the promissory note.

The supplement to the prospectus pointed out that it might be desirable for the herd owner to obtain an independent

---

[10]See note 9 *supra.*

appraisal of his herd prior to exercising his option and that upon request from the herd owner CCR would supply the names of independent appraisers located in the area where the owner's herd was being maintained.

Sometime prior to April 1974, CCR sent petitioner a letter describing the tax benefits to which herd ownership entitled him. A set of sample completed tax return forms showing how to claim the investment credit and the deductions for interest payments and depreciation attributable to the cattle was attached to the letter.

Subsequently, Schroeder informed Uhas that CCR had herds, each comprising 10 cows that were scheduled to calve in the spring of 1975, available for sale at a price of $20,000 cash. CCR guaranteed that, by June 30, 1975, each herd purchased under this offer would have increased to 20 animals as a result of the addition of 10 heifer calves.[11] Further, CCR offered a 3-year maintenance contract as part of the deal.[12]

Following his conversation with Schroeder, Uhas contacted petitioner to discuss the new CCR offering. Uhas suggested that the offering was being made because CCR was having trouble with its cash flow. He showed petitioner the following table, under the CCR letterhead, pertaining to the growth of a herd purchased under the terms of the new offering: [13]

ESTIMATED HERD INVENTORY

| Herd owner's calendar year | Cash outlay | Progeny growth | Estimated herd size |
|---|---|---|---|
| Date of purchase | $20,000 | --- | 10 |
| Dec. 31, 1974 | --- | --- | 10 |
| June 30, 1975 | --- | 10 | 20 |
| June 30, 1976 | --- | 6 | 26 |
| Sept. 20, 1976 | --- | 6 | 32 |

---

[11] The guaranty was to be implemented through CCR's agreement to exchange heifer calves for all of the bull calves born in the spring and its agreement to give the purchaser a heifer calf with respect to any cow that failed to calve in the spring.

[12] Apparently, the terms of this 3-year maintenance contract were identical to the 7-year contract covering herd No. 1, except there was no option to extend the 3-year agreement and CCR was not to receive any progeny from the first group of calves born to herd No. 2 in payment of the maintenance fee under the 3-year agreement.

[13] We note that this table, reproduced here, does not reflect herd growth over a 3-year period.

## HERD GROWTH BY CLASSIFICATION .

| Herd owner's calendar year | Herd cows | 2-Year-old or young cows | 12 to 18 months | Heifer calves |
|---|---|---|---|---|
| Date of purchase | 10 | --- | --- | --- |
| June 30, 1975 | 10 | --- | --- | 10 |
| June 30, 1976 | 10 | --- | 10 | 6 |
| Sept. 20, 1976 | 10 | 10 | 6 | 6 |

Herd valuations are determined basically from the reported sale prices received per lot as reported by the American Polled Hereford Association's official publication, the Polled Hereford World. The 8/15/74 published report stated that the female price per lot was $864.

Approximate herd size after 7 years of herd growth is 70 to 75 head of females.

At this point in time, petitioner had visited the ranch 2 or 3 times in connection with his investment in herd No. 1. He was impressed with the CCR operation and was interested in a second investment opportunity. He believed that the new offering was a good deal.

On September 20, 1974, petitioner purchased his second herd of 10 purebred polled Hereford cows (herd No. 2) from CCR for $20,000 cash. No written purchase or maintenance agreements were executed with respect to this transaction.

On or about September 27, 1974, Uhas sent petitioner a letter setting forth the tax deductions available as a result of the purchase of herd No. 2.

During 1973 and 1974, the fair market value of a polled Hereford cow was $700. Thus, at the time they were acquired, the fair market value of each of the herds purchased by petitioner was $7,000.

The prospectus given to petitioner prior to his investment in herd No. 1 states that CCR had acquired only a small portion of the animals offered for sale at $40,000 per herd and that it expected to acquire most of the remaining cattle to be sold under the offering at prices "between $400 and $1,200 per animal and at an average price of $600 per animal." The prospectus further states as follows:

The difference between the net price[14] of approximately $3,660 per animal

---

[14]The term "net price" as used here refers to the amount to be received by CCR after underwriting discounts and commissions, which amounted to 8½ percent of the purchase price.

to be received by * * * CCR for cattle in herds offered hereby and the price to * * * CCR for cattle purchased or to be purchased by it reflects the following costs and factors: cost of breeding and maintaining the animals prior to sale, cost of investigation and inspection of cattle in order to obtain quality animals, transportation and insurance for purchased animals, veterinarian fees, costs of this offering, financing costs, overhead charges for supervisory and management staffs and a profit to * * * CCR.

The prospectus warns that, in view of the markup involved with respect to the herds offered by CCR, a herd purchaser should anticipate a loss if he resells his cattle relatively early after their acquisition.

On his Federal income tax return for 1973, petitioner reported $40,000 as his cost basis in herd No. 1. He reported a cost basis of $20,000 in herd No. 2 on his Federal income tax return for 1974. On these tax returns, petitioner claimed investment credits and deductions for depreciation with respect to his investments in the cattle. He claimed depreciation as to herd No. 1 and herd No. 2 on his Federal income tax return for 1975.

Throughout 1973, 1974, and 1975, petitioner derived no pleasure or recreation from his involvement with CCR. Sometime during 1976, CCR went into bankruptcy due to significant increases in farm expenses and depressed prices in the cattle industry. As a result, the maintenance contracts petitioner had acquired became worthless. The Bank of the Commonwealth, assignee of petitioner's promissory note, gave petitioner the option of selling his cattle to the bank for $250 per head in discharge of the balance due on the note. He declined the option, took possession of the cattle, and arranged for their care on the Tom Reed Ranch. In 1978, he sold all of his cattle for $8,188.

In his notice of deficiency, respondent determined that petitioner's "cattle breeding activity" was not an activity engaged in for profit and that, therefore, the depreciation claimed by petitioner with respect to the cattle in 1973, 1974, and 1975 was not allowable. As a consequence of this determination, respondent also disallowed the investment credits claimed by petitioner in 1973 and 1974. In addition, respondent made the following alternative determination:

In the event it is held that this activity was engaged in for profit, it is determined that the alleged purchase prices of the cattle was [sic] in excess

of their fair market value. The excess over fair market value is an intangible asset and is not depreciable.

OPINION

## 1. Petitioner's Profit Motive

Consistent with the notice of deficiency, respondent contends that petitioner's cattle-breeding activity was "not engaged in for profit" within the meaning of section 183. To the contrary, respondent argues, petitioner "purchased his two cattle herds primarily to benefit from the tax advantages accruing to a fifty percent tax bracket taxpayer." On this ground, respondent would deny petitioner's claimed depreciation deductions for 1973, 1974, and 1975, as well as the investment credits claimed for 1973 and 1974. Petitioner maintains that he is entitled to the claimed investment credits and depreciation deductions.

Section 183,[15] on which respondent relies, was adopted as part of the Tax Reform Act of 1969, 83 Stat. 550, to replace the so-called "hobby loss" provisions of section 270. In broad terms, the section imposes limitations on deductions attribut-

---

[15]SEC. 183. ACTIVITIES NOT ENGAGED IN FOR PROFIT.

(a) GENERAL RULE.—In the case of an activity engaged in by an individual or an electing small business corporation (as defined in section 1371(b)), if such activity is not engaged in for profit, no deduction attributable to such activity shall be allowed under this chapter except as provided in this section.

(b) DEDUCTIONS ALLOWABLE.—In the case of an activity not engaged in for profit to which subsection (a) applies, there shall be allowed—

(1) the deductions which would be allowable under this chapter for the taxable year without regard to whether or not such activity is engaged in for profit, and

(2) a deduction equal to the amount of the deductions which would be allowable under this chapter for the taxable year only if such activity were engaged in for profit, but only to the extent that the gross income derived from such activity for the taxable year exceeds the deductions allowable by reason of paragraph (1).

(c) ACTIVITY NOT ENGAGED IN FOR PROFIT DEFINED.— For purposes of this section, the term "activity not engaged in for profit" means any activity other than one with respect to which deductions are allowable for the taxable year under section 162 or under paragraph (1) or (2) of section 212.

(d) PRESUMPTION.—If the gross income derived from an activity for 2 or more of the taxable years in the period of 5 consecutive taxable years which ends with the taxable year exceeds the deductions attributable to such activity (determined without regard to whether or not such activity is engaged in for profit), then, unless the Secretary or his delegate establishes to the contrary, such activity shall be presumed for purposes of this chapter for such taxable year to be an activity engaged in for profit. In the case of an activity which consists in major part of the breeding, training, showing, or racing of horses, the preceding sentence shall be applied by substituting the period of 7 consecutive taxable years for the period of 5 consecutive taxable years.

able to an "activity not engaged in for profit." See sec. 183(b). As defined in section 183(c), the term "activity not engaged in for profit" means any activity other than one with respect to which deductions are allowable under section 162, relating to expenses paid or incurred in carrying on a "trade or business," or under paragraph (1) or (2) of section 212, relating to expenses paid or incurred for the production of income or for the management, maintenance, or conservation of "property held for the production of income."[16] Under this definition—

Whether an activity is engaged in for profit is determined under section 162 and section 212(1) and (2) except insofar as section 183(d) creates a presumption [not here applicable] that the activity is engaged in for profit. [Sec. 1.183–1(a), Income Tax Regs.]

In general, deductions are allowable under sections 162 and 212(1) or (2) where a taxpayer, irrespective of whether others might view his expectations as reasonable, has engaged in an activity with the objective of making a profit. *Lamont v. Commissioner*, 339 F.2d 377, 380 (2d Cir. 1964), affg. a Memorandum Opinion of this Court; *Hirsch v. Commissioner*, 315 F.2d 731, 736 (9th Cir. 1963), affg. a Memorandum Opinion of this Court; *Jasionowski v. Commissioner*, 66 T.C. 312, 318–319 (1976). The courts have used words such as "basic," "dominant," "primary," "predominant," and "substantial" to describe the requisite profit motive. *Lamont v. Commissioner*, *supra* at 380 n. 4; *Hirsch v. Commissioner*, *supra* at 736; *Godfrey v. Commissioner*, 335 F.2d 82, 84 (6th Cir. 1964), affg. a Memorandum Opinion of this Court; *Allen v. Commissioner*, 72 T.C. 28, 33 (1979). The issue is one of fact to be resolved not on the basis of any single factor, but in the light of all facts and circumstances. *Allen v. Commissioner*, *supra* at 34.[17]

---

[16]Sec. 167(a) allows "as a depreciation deduction a reasonable allowance for the exhaustion, wear and tear * * * of property used in the trade or business" or "property held for the production of income." Sec. 48(a)(1) defines property with respect to which an investment credit is allowable under sec. 38 to include "only property with respect to which depreciation (or amortization in lieu of depreciation) is allowable." The "trade or business" and "production of income" requirements under sec. 167 are the same as those under secs. 162 and 212.

[17]Sec. 1.183–2(b), Income Tax Regs., lists a number of "relevant factors" that "should normally be taken into account" in determining whether an activity is engaged in for profit as follows: (1) Manner in which the taxpayer carries on the activity; (2) the expertise of the taxpayer or his advisers; (3) the time and effort expended by the taxpayer in carrying on the activity; (4) expectation that the assets used in the activity would appreciate in value; (5) the

We think petitioner had the requisite profit motive to qualify for the claimed investment credits and depreciation deductions. We point out that this is not a "hobby loss" case, the type of case toward which section 183 was primarily directed. *Dunn v. Commissioner*, 70 T.C. 715, 719–720 (1978), affd. 615 F.2d 578 (2d Cir. 1980); H. Rept. 91–413 (Part 1) (1969), 1969–3 C.B. 200, 245; S. Rept. 91–552 (1969), 1969–3 C.B. 423, 489. It is stipulated that petitioner "derived no pleasure or recreation from his involvement in Calderone-Curran Ranches, Inc."[18] Moreover, we do not think the evidence permits a finding, as respondent argues, that petitioner purchased his herds primarily to gain the tax advantages accruing from those transactions.

We begin with the objective[19] fact that petitioner made a reasonable inquiry before making the investment to see that it had profit potential. Although he was not a cattle expert and did not consult independent experts, before purchasing herd No. 1 in 1973 he visited the CCR ranch and reviewed its operations. Based on his inspection, he concluded that the ranch was well managed. He learned that the ranch produced its own feed and used scientific breeding practices to upgrade the herd. Petitioner's inquiries of others confirmed his conclusion that the ranch was well managed, and he was advised that it was solvent.[20] His advisers persuaded him that the investment was a good one. Petitioner was concerned about inflation and, based on his inquiries, he became convinced that the appreciation in the price of the cattle would be 10 to 12

---

success of the taxpayer in carrying on other similar or dissimilar activities; (6) the taxpayer's history of income or losses with respect to the activity; (7) the amount of occasional profits, if any, which are earned; (8) the financial status of the taxpayer; and (9) elements of personal pleasure or recreation. The regulation emphasizes that "all facts and circumstances with respect to the activity are to be taken into account."

[18]Sec. 1.183–2(b)(9), Income Tax Regs., states that "a profit motivation may be indicated where an activity lacks any appeal other than profit."

[19]Sec. 1.183–2(a), Income Tax Regs., provides:

"The determination whether an activity is engaged in for profit is to be made by reference to objective standards, taking into account all of the facts and circumstances of each case. Although a reasonable expectation of profit is not required, the facts and circumstances must indicate that the taxpayer entered into the activity, or continued the activity, with the objective of making a profit. * * * "

[20]The prospectus contains operating statements of CCR for 1968–71 which show that it made a substantial, increasing profit in the last 3 years and had only a relatively small loss in 1968. The prospectus also contains a balance sheet for CCR as of Dec. 31, 1971, reflecting a stockholders' equity of $5,449,401.

percent per year and that they would be worth $1,000 per head at the end of 12 years.

Petitioner did not expect to make money immediately but intended to hold herd No. 1 for 12 years. He testified that he thought he could "go in for 12 years, they would take care of my cattle, sell my cattle, I come up with a net profit." In reaching his conclusion, he gave weight to the projection in the prospectus showing that he would have 182 cattle at the end of 12 years and that CCR would pay him $80,000 for his herd.[21] As he explained it, "I invest $40,000.00, I get $80,000.00 back, that's $40,000.00 capital gain."

In weighing and considering the investment merits of the program, petitioner and Uhas focused not only on tax consequences but on certain provisions of the maintenance contract offered to herd purchasers. The contract covered a 7-year term with an option to renew for an additional 5 years. No cash outlay for the 12-year period beyond the initial $40,000 would be required in the 1973 transaction because the maintenance fees provided for in the contract were a specified portion of the progeny to be born to the herd. The contract included a provision requiring the replacement by CCR of animals between the ages of 1 and 11 in the event of death or infertility. In addition, CCR would be obligated (at the purchaser-owner's option) to purchase all animals owned by the purchaser at the end of the 5-year renewal period for prices (subject to an aggregate maximum price of $80,000) specified in the maintenance contract. As petitioner points out, those prices, which constituted the minimum that an investor could receive after 12 years, assured the investor of a profit of some $29,000[22] without regard to tax deductions,

---

[21]See *Metcalf v. Commissioner*, T.C. Memo. 1963–277; *Ellsworth v. Commissioner*, T.C. Memo. 1962–32, where it is recognized that the development of a breeding herd constitutes profit-seeking activity even though profits may only be expected in the long-run. Cf. sec. 1.183–2(b)(4), Income Tax Regs., noting that the term "profit" encompasses appreciation in assets, and sec. 1.212–1(b), Income Tax Regs., stating that the term "income" includes potential gains from the disposition of property for purposes of determining whether a taxpayer is engaged in an activity for the production of income. See also *Engdahl v. Commissioner*, 72 T.C. 659, 669 (1979).

[22]This figure is calculated as follows:

Maximum aggregate price to be paid by CCR
at end of 12 years ................................................. $80,000.00

assuming that herd growth approximated CCR's projections.[23]

Respondent questions the reasonableness of petitioner's reliance on CCR's projection of herd growth, particularly because, respondent argues, petitioner made no independent attempt to evaluate the survival rate of calves less than 1 year of age, i.e., those which were not covered by CCR's replacement obligation under the maintenance contract. Petitioner testified, however, that he learned on his visit to the ranch that the mortality rate of the cattle was very low. We think it significant in this connection that respondent merely questioned, but did not introduce evidence to undermine, the reasonableness of CCR's herd growth projections. More importantly, however, petitioner, in analyzing the CCR investment, did not accept those projections at face value but took them "on a 75 percent basis." On this conservative basis, petitioner could still have obtained a substantial profit without the benefit of the investment credit or any depreciation deductions.[24] This would have been the case even if the price of cattle did not rise during the 12-year period. To the extent that it might increase, petitioner stood to make greater gains.

Respondent also questions whether petitioner ever intended to hold herd No. 1 for 12 years. He contends that petitioner could have withdrawn from the maintenance program by abandoning his cattle in an early year when tax savings exceeded cash outlay because, respondent states, it was not likely that CCR would press petitioner's obligation for the

---

Less: Total cash outlay involved in purchasing
herd No. 1, including interest to be paid over 7 years .............. $50,777.99
Profit ................................................................. 29,222.01

[23]Compare *Ginsburg v. Commissioner*, T.C. Memo. 1976–199, where a repurchase price guaranteed by the promoter of a cattle-breeding package would have resulted in a loss to the investor.

[24]Taking CCR's projection as 75-percent accurate, petitioner's profit without regard to taxes on a sale to it under the repurchase obligation at the end of 12 years would be as follows:

| Number of cattle projected | Age of cattle | Contract price | 75 Percent of projection | Proceeds of sale |
|---|---|---|---|---|
| 35 | Up to 1½ years | $300 | 26 | $7,800.00 |
| 91 | 1½ to 5 years | 600 | 68 | 40,800.00 |
| 56 | Over 5 years | 400 | 42 | 16,800.00 |
| | | | | 65,400.00 |
| | Less total cash outlay | | | 50,777.99 |
| | Profit | | | 14,622.01 |

balance due on the $32,500 note. However, there is absolutely no evidence to show that petitioner at any time intended to "withdraw" from the program under such circumstances or that CCR would not have enforced the obligation.[25] Had petitioner intended to withdraw from the program, CCR's bankruptcy in 1976 provided the perfect opportunity for him to do so and harvest his tax losses. He did not do so. Instead, he rounded up his cattle and moved them to another ranch.

Although the record with respect to petitioner's investment in herd No. 2 leaves something to be desired, we find that it, too, was made with the objective of deriving an economic profit apart from the tax benefits. At the time that he made this investment, petitioner had the benefit of experience with his investment in herd No. 1 and had visited the CCR ranch several times. The tax benefits resulting from this purchase, while not insubstantial, were reduced due to the fact that petitioner paid cash for herd No. 2. The fact that he paid cash of $20,000, the total purchase price, in 1974 for this herd strongly suggests that he bought this herd as well as the one in 1973 for the purpose of making a profit.

We have no doubt that, in making his initial decision to buy the cattle, petitioner took into account the investment credit and tax deductions to which he would become entitled. In fact, he frankly so testified at the trial, and the prospectus explicitly states that the purchase of cattle "is considered suitable primarily by investors in the higher tax brackets because of certain tax benefits available" to them. Petitioner had substantial income from sources other than his cattle-breeding investments. Cf. sec. 1.183–2(b)(8), Income Tax Regs. Like every other businessman in that situation, he no doubt considered the tax consequences of his investments very carefully.

For our purposes, in weighing the importance of the tax considerations present in these transactions, however, the precise nature of the tax benefits obtained by petitioner is

[25]According to the pro forma investment analysis sent to petitioner by Uhas in February 1973, the cumulative cost after tax savings was less than the cumulative cash outlay only in 1974 (by $689) and in 1975 (by $696). Considering that there would have been a substantial balance remaining on a negotiable promissory note at the end of any one of those years, these tax savings hardly seem to be sufficient inducement to make the investment with the intent to abandon the cattle and reap the "tax savings."

important. We are not dealing with nonrecourse liabilities designed to enlarge a taxpayer's basis for depreciation or gain or loss.[26] In the case of the 1974 investment, petitioner paid the full purchase price ($20,000) in cash. In the case of the 1973 investment, petitioner paid $7,500 in cash and signed a negotiable promissory note in the amount of $32,500 for the balance, payable over 7 years, with some two-thirds of the balance due during the last 3 years.[27] Although the promissory note was secured by a mortgage on the cattle, petitioner was committed unconditionally to ultimately pay the full $40,000, with interest.[28]

Petitioner's claimed depreciation deductions under section 167 and investment credits under section 38 thus reflect the recovery of his actual investments of tax-paid dollars. According to the pro forma investment analysis which petitioner received from Uhas before he made his 1973 investment, petitioner would make a total cash outlay of $51,594 over the 7-year period and this outlay would qualify him for total deductions (not tax benefits) over that period of $50,094 (depreciation of $38,500 and interest of $11,594) and an investment credit of $2,800. Although these deductions and credit would precede the receipt of income from the cattle venture and would reduce his taxable income from other sources in the early years, only in the second and third year, according to the investment analysis, would the tax benefits (assuming a 50-percent tax rate) exceed his cash outlay. The excess in those 2 years is a total of only $1,119. For one in the 50-percent bracket, a net tax saving of $27,847 would be

[26]Compare *Ginsburg v. Commissioner*, T.C. Memo. 1976–199, where the taxpayer gave a mortgage on which he had no personal liability to cover four-fifths of the purchase price of cattle and claimed depreciation, including the nonrecourse liability in his basis, and *Hager v. Commissioner*, 76 T.C. 759 (1981), where a partnership paid $20,000 in cash, executed a short-term note of $529,000 on which the partnership was liable, and gave a $1,065,000 nonrecourse note.

[27]Liability on the promissory note was not conditioned on CCR's performance of its maintenance contract, and the prospectus cautioned purchasers as follows:

"The Promissory Notes signed by purchasers of herds on the deferred payment plan are negotiable. If the Company [CCR] assigns or pledges the Notes to a financing institution, investors may have no defense against such institution in the event the Company defaults on its obligations under the Sale Agreement and/or the Maintenance Contract.* * * "

[28]When CCR went into bankruptcy in 1976, petitioner's note had already been assigned to the Bank of the Commonwealth, and there is no evidence to suggest that petitioner did not pay the note in full.

realized over 8 taxable years in return for a cash outlay of $51,594. For the second purchase, petitioner made an initial outlay of the full $20,000 cost, and his tax deductions for depreciation and his investment credit would reflect merely the recovery of his investments.

As respondent apparently recognizes, the tax consequences of true business transactions are a legitimate and, often, paramount concern of the interested parties. The tax law, itself, contains many provisions, including the provisions for accelerated depreciation and the investment credit, designed to encourage certain courses of business or investment activity. In contending that petitioner purchased the cattle "primarily to benefit from the tax savings," however, respondent seems to suggest that an activity may be considered as "not engaged in for profit" if it appears that tax reasons affected the decision to enter into the activity, as opposed to some other money-making venture.[29] Section 183 does not go this far; it must be reconciled with the principle that a taxpayer has the right to engage in a venture which has economic substance even though his motivation in the early years of the venture may have been to obtain a deduction to offset taxable income. *Van Raden v. Commissioner*, 71 T.C. 1083, 1112 (concurring opinion) (1979), affd. 650 F.2d 1047 (9th Cir. 1981); *McLane v. Commissioner*, 46 T.C. 140, 145 (1966), affd. per curiam 377 F.2d 557 (9th Cir. 1967); *Starr v. Commissioner*, 46 T.C. 450, 460 (1966).[30]

Although it is clear that petitioner took into account tax considerations in making his investment decisions, we are convinced that he purchased the cattle and continued to hold them throughout the years in question with the predominant purpose and objective of deriving a profit. In calculating the anticipated profit over the long haul, we think he took into account the economic consequences of the venture apart from

---

[29]Respondent's suggestion that petitioner could have made money more safely by depositing the purchase price in a bank than he could have by investing in a CCR herd is irrelevant. As stated in sec. 1.183-2(b)(9), Income Tax Regs., "the availability of other investments which would yield a higher return, or which would be more likely to be profitable, is not evidence that an activity is not engaged in for profit."

[30]The Commissioner has recognized, for example, that sec. 183 does not apply in the case of a low and moderate income housing project even though it is anticipated that losses from its operations will continue for 20 years. See Rev. Rul. 79-300, 1979-2 C.B. 112.

its tax benefits. Based on all the facts and circumstances contained in the record before us, we find that petitioner's objective was to make a profit and that section 183 has no application here.

## 2. Respondent's Alternative Determination

Having found that petitioner's investment in CCR herds was an activity engaged in for profit, we must now consider respondent's alternative determination. Relying upon *Bernuth v. Commissioner*, 57 T.C. 225 (1971), affd. 470 F.2d 710 (2d Cir. 1972), respondent contends that the amount of the purchase price of each herd in excess of the fair market value of cattle at the time of purchase represents an intangible, nonamortizable "premium" paid to CCR for arranging the cattle-breeding investment package. He views this "premium" as an asset wholly separate and apart from the cattle or the maintenance contracts, similar in nature to the "going concern value" of a business "which is not subject to depreciation because it is independent of the individual assets and could exist for the life of the business." Thus, respondent would limit petitioner's basis for depreciation of his cattle to their fair market value at the time of purchase and would deny petitioner any deduction for depreciation or amortization of the amount paid to CCR as a "premium."

Petitioner's primary position is that he paid $40,000 for herd No. 1 and $20,000 for herd No. 2 in arm's-length transactions with CCR and that his basis for depreciation of the cattle should be the amounts actually paid for them. In the alternative, petitioner argues that amounts paid by him in excess of the fair market value of the cattle should be allocated to the maintenance contracts and that, as part of the cost of acquiring those contracts, such amounts are amortizable.

We agree with respondent that the basis in petitioner's cattle should be limited to their fair market value. We agree with petitioner, however, that the amounts paid by him in excess of the fair market value of the cattle should be allocated to the maintenance contracts.

### A. The Basis in Petitioner's Cattle

As a general rule, the basis of property for tax purposes will be its cost (sec. 1012) and, in a money-for-property transaction,

cost is equal to the price paid for the property. *Edwards v. Commissioner*, 19 T.C. 275, 279 (1952). However, as we have stated before, this rule—

does not apply where a transaction is not conducted at arm's-length by two economically self-interested parties or where a transaction is based upon "peculiar circumstances" which influence the purchaser to agree to a price in excess of the property's fair market value.

*Bixby v. Commissioner*, 58 T.C. 757, 776 (1972). See *Jordan v. Commissioner*, 60 T.C. 872, 879–881 (1973), affd. per curiam 514 F.2d 1209 (8th Cir. 1975). In such cases, the basis of property for tax purposes may be limited to its fair market value. See, e.g., *Mountain Wholesale Co. v. Commissioner*, 17 T.C. 870, 875 (1951); *G.U.R. Co. v. Commissioner*, 41 B.T.A. 223 (1940), affd. 117 F.2d 187 (7th Cir. 1941).

In terms of the total consideration passing between petitioner and CCR as a result of the herd-purchase and maintenance agreements, petitioner's dealings with CCR were clearly carried on at "arm's length." We have no doubt that both petitioner and CCR were, in general, "economically self-interested." Nonetheless, we think that this was not the case with respect to the establishment of a purchase price for the cattle independent of the maintenance contract offered to a herd purchaser.

The herd-purchase and maintenance agreements with respect to each herd were formally separate agreements, with separately stated consideration.[31] Thus, theoretically, as stated by petitioner on brief, herd owners "were not required to enter into the maintenance contracts and could have exercised complete control over their herds by the simple expedient of removing their herds from the Calderone-Curran ranches." Normally, this would be evidence that the price of the cattle in each transaction was separately bargained for; however, this option to exercise control over a herd without regard to the maintenance contract was more apparent than real.

From the prospectus, it is clear that the stated price of herds was highly inflated above the market value of the animals and that the stated consideration for the maintenance contracts

[31]No writings were executed with respect to the purchase of herd No. 2, but the record indicates that the purchase and maintenance agreements were basically similar to those entered with respect to herd No. 1.

was less than the cost of comparable service from other sources. The prospectus states that a "purchaser should anticipate a loss if he resells his cattle relatively early after their acquisition." The prospectus also warns that if a purchaser is forced to find some organization other than CCR to manage his herd, "the maintenance fee may be substantially higher than that offered" by CCR. In this connection, it should be emphasized that CCR was not simply selling cattle; it was offering "managed breeding herds" to investors. Thus, although the cattle-purchase and maintenance agreements were formally independent of each other, we think that petitioner has most aptly characterized the nature of his dealings with CCR when he states that he "purchased a package which contained two elements: (1) the cattle; and (2) the maintenance contract."

There is no evidence that any of the cattle purchased by petitioner possessed special characteristics which would give them a value in excess of the stipulated fair market value of cattle.

Clearly, however, in purchasing a "package" comprising cattle and a maintenance contract, petitioner had an obvious incentive to agree to an inflated purchase price for the cattle (at the expense of what might otherwise be treated as prepaid maintenance) so as to increase the investment credit and deductions for accelerated depreciation to which he would be entitled. At the same time, CCR in offering "managed breeding herds" had an incentive to include disguised future maintenance fees in the sales price of the cattle. By so doing, CCR could confer the above tax benefits on its investors at little or no cost to itself, thus sweetening the investment for the high-bracket taxpayers for whom the breeding program was designed. In these "peculiar circumstances" (*Bixby v. Commissioner, supra*), we find that petitioner's cost basis in his cattle must be limited to their fair market value, i.e., $7,000 per herd. Compare *Bernuth v. Commissioner, supra.*

It is true, as petitioner emphasizes, that payment of the stated purchase price was in no way contingent upon the performance by CCR of its obligations under the maintenance contracts. However, we think this was simply one of the risks that petitioner was willing to assume in the hope of increasing the tax benefits resulting from the purchase of cattle; his

inquiries prior to the purchase of herd No. 1 convinced him that CCR was solvent and capable of fulfilling its obligations.

Moreover, petitioner implicitly admitted that he knew the considerations stated in the contracts were unrealistic. When asked at trial to explain the difference between the $40,000 price for herd No. 1 (with respect to which a 7-year maintenance contract and 5-year renewal option was offered) and the $20,000 price for herd No. 2 (which carried with it a 3-year maintenance contract), petitioner answered that it was attributable to "the maintenance contract * * * , three years against seven." We do not think petitioner has ever seriously believed that the stated purchase price of either herd was paid solely for the cattle.

### B. Characterization of the Excess Over the Fair Market Value of Cattle

Respondent relies upon *Bernuth v. Commissioner, supra,* in arguing that "premiums" paid for the cattle, i.e., those amounts in excess of the fair market value of the cattle, represent a nonamortizable intangible asset independent of the cattle or the maintenance contracts. We think respondent reads too much into *Bernuth.*[32] Moreover, we think it clear from the record that the amounts paid by petitioner in excess of the fair market value of cattle are attributable to the maintenance contracts.

The prospectus attributes the difference between the price CCR received for the cattle and the price it paid for them (which was approximately the stipulated fair market value) to a variety of "costs and factors," including breeding and maintenance of animals prior to sale, investigation and inspection of the cattle in order to obtain quality animals,

---

[32]In *Bernuth v. Commissioner,* 57 T.C. 225, 236–237 (1971), affd. 470 F.2d 710 (2d Cir. 1972), the Court stated that if the taxpayer, an investor in an oil venture, had paid a "premium" to the promoter for arranging the investment "package" which consisted of a working interest and a drilling contract, then the "premium should be allocated to the various elements of the package" in relation to the fair market value of each element. The Court then referred to cases where groups of assets had been purchased for a single price and the basis of individual assets was determined by allocating the aggregate cost to the individual assets based upon the fair market value of each asset. There is no suggestion that the premium which may have been paid in *Bernuth* constituted an asset in and of itself.

In this connection, we note that we find respondent's reference to cases involving the transfer of the "going concern value" of a business to be inapposite here. Petitioner did not purchase a going concern. He purchased cattle with maintenance contracts which were not assignable by him.

transportation and insurance for purchased animals, veterinarian fees, costs of the offering, financing costs, overhead charges, and a profit to CCR. As respondent points out, these items, "together with * * * CCR's grazing lands, breeding program, and guarantee against infertility and other undesirable characteristics, must account for some portion of the purchase price paid for the respective herds."

We agree that part of the consideration is attributable to these "costs and factors." Many of the items emphasized by respondent, however, are maintenance related (e.g., grazing lands and breeding programs, as well as the bulk of overhead charges and a profit to CCR). As previously pointed out, CCR was in the business of selling "managed breeding herds." Once having obtained a fair price for the cattle, it could profit only by carrying out the maintenance contracts.

To the extent that those "costs and factors" relied upon by respondent as the basis for finding a nonamortizable asset are not maintenance related, we think they simply represent an attempt by CCR to give the appearance of economic reality to the inflated prices assigned to its herds in the prospectus. Some of those items, such as transportation, inspection of animals, and veterinarian fees, were includable in the fair market value of the cattle on hand at the CCR ranches where delivery was made. Other items, such as breeding prior to sale, appear to be without substance.[33] After reviewing the entire record, we are convinced that the amounts in excess of the fair market value of the cattle are allocable to the maintenance contracts.[34]

---

[33]The pro forma investment analysis in the prospectus contemplated that an investor's herd would not be bred until 3 months after its purchase by the investor.

[34]A "statement of operations" of CCR was included in the prospectus, and it contains the following information:

| | Aug. 28 (date of inception) to Dec. 31, 1968 | Years ended Dec. 31— | | |
| --- | --- | --- | --- | --- |
| | | 1969 | 1970 | 1971 |
| Revenues: | | | | |
| Sales of purebred herds | $212,500 | $1,714,954 | $2,149,019 | $5,869,511 |
| Herd maintenance income (Note 3) | 37,500 | 11,850 | 223,850 | 366,050 |
| Costs of sales and expenses: | | | | |
| Cost of purebred | | | | |

*C. Amortization of the Excess Over Fair Market Value*

It is well established that an intangible asset, such as a contract right, is depreciable or amortizable to the extent that it has a reasonably determinable useful life. E.g., sec. 1.167(a)–3, Income Tax Regs.; *Van De Steeg v. Commissioner*, 60 T.C. 17, 27 (1973), affd. per curiam 510 F.2d 961 (9th Cir. 1975); *Stewart Title Guaranty Co. v. Commissioner*, 20 T.C. 630, 635 (1953). Here, the maintenance contract entered into with respect to herd No. 2 had a definite 3-year life; it was not subject to renewal. We think it clear that the amount of the purchase price of herd No. 2 allocable to the maintenance contract should be amortized over a 3-year period.

The maintenance contract entered into in connection with the purchase of herd No. 1 had an initial term of 7 years, with an option to renew for an additional 5 years. Petitioner argues that amortization with respect to this contract should be computed over a 7-year period. We disagree. Petitioner testified that in analyzing the profitability of his first investment he focused on the entire 12-year period and on CCR's "repurchase" obligation at the end of that period. Petitioner has convinced us that it was a very definite possibility, if not a certainty, that he would have opted to renew the maintenance contract had CCR not gone bankrupt. For this reason, amortization with respect to the maintenance contract for herd No. 1 should be computed with reference to a 12-year life.[35] See *Jos.*

| | | | |
|---|---|---|---|
| herds sold .......................... $209,380 | $363,802 | $352,795 | $728,970 |
| Cost of purebred cattle replacements ..................................................... | | 65,828 | 155,525 |
| Selling commissions ......................................... 17,328 | 122,684 | 515,294 | |
| Herd and ranch maintenance expenses ............ 76,232 | 347,986 | 606,000 | 1,045,986 |
| Selling, general, and administrative expenses ......... 10,261 | 51,819 | 113,872 | 242,606 |

Although this information deals with the years 1968 through 1971, the prospectus indicates that during those years CCR sold managed breeding herds similar to those offered under the prospectus. We think that the vast surplus of revenues from sales of purebred herds over the cost of those herds, when compared with the great deficit of herd maintenance income under the amount of the expenses incurred in maintaining the herds and the ranch, is revealing. Although some of the disparity between expenses and maintenance income is apparently due to the cost of raising purebred bulls and feeder cattle, it seems clear that CCR did not look solely to "herd maintenance income" to cover the expenses of maintaining those herds. Instead, it inflated the initial sales price of the cattle for this purpose.

[35]Although the straight-line method under which amortization is computed will not reflect the fact that maintenance costs would be lower in the early years and increase over the term

*N. Neel Co. v. Commissioner*, 22 T.C. 1083 (1954); *Pittsburgh Union Stock Yards Co. v. Commissioner*, 16 B.T.A. 139 (1929), affd. 46 F.2d 646 (3d Cir. 1931). Cf. sec. 178(a); *Giumarra Bros. Fruit Co. v. Commissioner*, 55 T.C. 460 (1970).

To reflect the foregoing,

*Decision will be entered under Rule 155.*

of the maintenance contracts, we think that this factor of increasing costs is adequately reflected in both maintenance contracts because CCR would receive an increasing number of progeny from growing herds as part of its maintenance fee.