EDWARD W. EDWARDS AND ELEANORE Z. EDWARDS, PETITIONERS, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

Docket No. 33702. Promulgated November 21, 1952.

*Orie S. Ware, Esq., James C. Ware, Esq.,* and *Frank Gofton Ware, Esq.,* for the petitioners.
*Wm. R. Bagby, Esq.,* for the respondent.

OPINION.

JOHNSON, *Judge:* Respondent has determined a deficiency of $353,-663.46 in petitioners' income tax for the calendar year 1944.

The sole issue before us is whether the compromise of an indebtedness, evidenced by two notes, resulted in a reduction of basis of common stock; the stock was originally deposited as collateral security, later withdrawn, and after the compromise sold. Respondent made certain other adjustments to the petitioners' net income, but these adjustments are not contested.

All of the facts were stipulated and are so found.

The petitioners are husband and wife, with their residence at Cincinnati, Ohio. They filed a joint return for the calendar year 1944 with the collector of internal revenue for the first district of Ohio. Edward W. Edwards will hereinafter be referred to as the petitioner.

On or about May 28, 1930, petitioner offered to purchase 32,228 shares of stock of the Valvoline Oil Company from the Paragon Refining Company. On June 24, 1930, petitioner's offer was accepted and approved by the stockholders of the Paragon Refining Company. Pursuant to this agreement, on September 3, 1930, petitioner was billed

for the stock at the rate of $199.614 per share, or an aggregate of $6,433,157.

On or about October 24, 1930, the stock was tendered to petitioner and demand was made for full payment, plus interest at the rate of 6 per cent per annum from September 30, 1930. On October 28, 1930, petitioner paid Paragon Refining Company the sum of $6,433,157, plus interest in the amount of $49,142.19, as full payment for the stock.

Rather than liquidate his assets, petitioner borrowed three million dollars from the National City Bank of New York and three million from the Chase National Bank of New York to pay for the stock. These two debts were evidenced by collateral loan notes. The original notes matured in six months and thereafter from time to time renewals were executed. These loans, on October 28, 1930, were secured by collateral as follows:

National City Bank of New York:

| | |
|---|---:|
| 16,114 shares Valvoline Oil Company, common stock (cost) | $3,216,580 |
| 35,000 shares Columbia Gas & Electric Company, common stock | 1,610,000 |
| Total | $4,826,580 |

Chase National Bank:

| | |
|---|---:|
| 16,114 shares Valvoline Oil Company, common stock (cost) | $3,216,580 |
| 34,037 shares Columbia Gas & Electric Co., common stock | 1,565,702 |
| 1,500 shares National Cash Register Co., common stock | 49,500 |
| Total | [1] $4,811,782 |

Between October 28, 1930, and January 23, 1933, petitioner withdrew from the collateral deposited with the National City Bank of New York 3,426 shares of Valvoline Oil Company common stock, and deposited an additional 5,000 shares of Columbia Gas & Electric Company common stock, 5,496 shares of American Thermos Bottle, 4,000 shares of Corcoran Brown Lamp, and 100 shares of Edwards Manufacturing Company common stock. Prior to the year 1941, the stock of the Corcoran Brown Lamp Company was disposed of by the bank. During the year 1941, 5,496 shares of American Thermos Bottle were sold by the bank, and on December 13, 1941, 500 shares of Valvoline Oil Company common stock were sold by the bank, and the proceeds applied to the loan. On January 13, 1942, 100 shares of Edwards Manufacturing Company common stock were sold by the bank and the proceeds credited to petitioner's note. On April 16, 1942, petitioner received 12,188 shares of the Valvoline Oil Company common stock, held as collateral by the National City Bank, upon payment by him to the bank of $195,008, which was credited to his note. During the period February to September, 1943, the National City Bank sold 40,000 shares of Columbia Gas & Electric Company common

[1] Arithmetical error as found in Stipulation of Facts.

stock, held as collateral, and the proceeds applied on petitioner's note. With the sale of the Columbia Gas & Electric Company common stock, the collateral note was then unsecured. On November 17, 1943, the indebtedness to the bank had been reduced to the sum of $1,752,580.53 as principal, and there was accrued interest in the amount of $294,-289.47. After protracted negotiations, on November 17, 1943, the National City Bank of New York canceled the indebtedness and interest accruals upon petitioner's payment of $25,000.

Between October 28, 1931, and January 23, 1933, petitioner withdrew from the collateral at the Chase National Bank 2,905 shares of the Valvoline Oil Company common stock, and deposited, during the same period, 1,044 shares of National Cash Register common stock, 11,980 shares of Galina Oil Corporation stock, 4,000 shares Corcoran Brown Lamp Company stock, 80 shares Edwards Manufacturing Company stock, and 2,000 shares of the J. G. Wilson Corporation. The stock of the Galina Oil Corporation, Corcoran Brown Lamp Company, and J. G. Wilson Corporation was disposed of by the bank prior to 1942. On April 16, 1942, petitioner received 13,209 shares of the Valvoline Oil Company common stock, held as collateral by the Chase National Bank, upon his payment of $211,344. This amount was applied on his Chase National Bank note. On August 14, 1942, eighty shares of the Edwards Manufacturing Company common stock were sold by the bank for $160,000 and his note was credited with the proceeds thereof. During 1943 the Chase National Bank sold 2,544 shares of the National Cash Register Company, and thereafter, during the period February to September, 1943, 36,047 shares of the Columbia Gas & Electric Company common stock were sold by this bank and the proceeds from the sale of both stocks applied to reduce his loan. After the sale of the last of the Columbia Gas & Electric Company common stock, in September 1943, the collateral note of the Chase National Bank of New York was then unsecured. On November 22, 1943, the indebtedness to the bank had been reduced to the sum of $1,845,971.75 as principal, and accrued interest in the amount of $90,242.27. On November 22, 1943, as the result of negotiations, the Chase National Bank canceled petitioner's indebtedness upon his payment of $25,000.

Immediately before and immediately after the National City Bank of New York canceled its notes on payment of $25,000 on November 17, 1943, and immediately before and immediately after the Chase National Bank of New York canceled its notes on payment of $25,000 on November 22, 1943, petitioner was insolvent.

The cancelations of indebtedness by the Chase National Bank and National City Bank were disclosed by petitioner on his calendar year 1943 income tax return as an amount received claimed to be nontaxable.

On June 20, 1944, petitioner sold 31,329 shares of the common stock of the Valvoline Oil Company for $103.50 a share, or a total of $3,237,551.50. This sale was reported on his 1944 income tax return as follows:

On June 20, 1944, sold:

| | |
|---|---:|
| 31,329 shares common stock of Valvoline Oil Company, Cincinnati, Ohio, at 103.50 per share, total | $3,237,551.50 |
| Less legal fees | 2,500.00 |
| | $3,235,051.50 |

This stock had been purchased at various dates, as follows:

| | | | | |
|---|---|---|---|---:|
| Sept. 3, 1930, | 25,433 | shs. at | 199.614 | $5,076,782.86 |
| April 8, 1931 | 4 | " " | 96.00 | 384.00 |
| May 21, 1936 | 5 | " " | 13 | 65.00 |
| May 26, 1937 | 1 | " " | 60 | 60.00 |
| Dec. 10, 1942 | 100 | " " | 14½ | 1,450.00 |
| Dec. 28, 1942 | 5,735 | " " | 20 | 114,700.00 |
| Jan. 5, 1943 | 25 | " " | 16 | 400.00 |
| Feb. 16, 1943 | 26 | " " | 21 | 546.00 |
| | 31,329 | | | $5,194,387.86 |

| | |
|---|---:|
| Net Loss | $1,959,336.36 |
| Recognized Loss—50% | 979,668.18 |
| Net recognized loss | 1,000.00 |

The respondent, in determining the deficiency, disallowed the net loss of $1,959,336.36 and net recognized loss of $1,000. He then determined that petitioner had a capital gain of $1,594,215.92 and net recognized capital gain of $797,107.96 from the sale of this stock. With other adjustments the net capital gain for the year 1944 amounted to $702,817.41. The 25,433 shares of stock purchased September 3, 1930, include the 13,209 shares and the 12,188 shares which were withdrawn from the collateral held by the banks on April 16, 1942. The respondent, in his notice of deficiency, determined the basis of these 25,433 shares of Valvoline Oil Company stock to be $1,528,230.58, which is a difference between the basis claimed by the petitioner of $5,076,782.86 and the amount of the total principal forgiveness by the National City Bank and Chase National Bank in the total amount of $3,548,552.28.

The basis of the 25,433 shares of Valvoline Oil Company stock is $5,076,782.86.

There is no suggestion of fraud or collusion in any of petitioner's transactions.

The issue presented is the determination of the correct basis for the computation of gain or loss on the sale in 1944 of 25,433 [2] shares of

---

[2] The number of shares as reported in the deficiency notice was 25,494, valued at $1,529,685.58, but in the Stipulation of Facts it was agreed that the number of shares in dispute was 25,433.

Valvoline Oil Company stock. The petitioner contends that the proper basis for 25,433 shares is $5,076,782.86, which was the actual original cost. However, the respondent determined the correct basis to be the original cost, less a sum of canceled indebtedness in the amount of $3,548,522.28, which resulted in a net basis of $1,528,230.58 for the stock.

The position of the petitioner is that if the cancelation of the indebtedness resulted in income to him, it would have been income in 1943, when the debt was canceled, and further, the cancelation would not have reduced the basis of stock sold in a separate transaction in 1944. The year 1943 is not before us.

The theories of respondent are: (1) that petitioner's stock cost or "net investment" was $1,528,230.58; (2) there was a reduction in the purchase price of the 25,433 shares of stock.

In resolving these issues here we must recognize that there are four separate transactions, each of which must be considered. First, petitioner bought the stock from the Paragon Refining Company. Second, petitioner borrowed money from two banks; petitioner executed a note and deposited his stock as security. Third, the banks forgave part of petitioner's indebtedness upon petitioner's inability to pay the bank notes, and fourth, petitioner sold his stock. While not actually saying so, the respondent would have us believe that the first two transactions were one, that is, that petitioner bought the stock from the bank so that petitioner and bank were in a vendor-vendee relationship. However, the facts do not sustain this contention.

Section 113 (a) of the Code provides that the unadjusted basis of property "shall be the cost of such property." The regulations do not define the term "cost," so we must look elsewhere for a definition. Cost, as defined in Webster's New International Dictionary, is "the amount or equivalent paid, or given, or charged, or engaged to be paid or given for anything bought or taken in barter or for service rendered." More succinctly and for our purposes, cost of the stock is the amount petitioner paid Paragon for the stock. This is the cost to petitioner. See *Detroit Edison Co.* v. *Commissioner*, 319 U. S. 98. It is undisputed that petitioner contracted to purchase 32,228 shares of the Valvoline Oil Company stock for $6,433,157, and later did pay this sum in full for the purchase of the stock. The Paragon Refining Company was the vendor; the petitioner was the vendee. After payment for the stock, Paragon was no longer an interested party. The petitioner, as owner, held full title to the stock. As of the completion of the purchase, the cost, which was the unadjusted basis, was $6,433,-157, or $199.614 per share. See *Crane* v. *Commissioner*, 331 U. S. 1.

Now to determine the basis for gain or loss it may be necessary to make certain adjustments to the unadjusted basis. Respondent has

determined that the discharge of indebtedness by the Chase National Bank and City National Bank, both of New York, some thirteen years after the original purchase requires an adjustment to the unadjusted basis. The Code, in section 113 (b), sets forth the principal adjustments to determine basis for the computation of gain or loss. We see no requirement which demands an individual taxpayer to make an adjustment to his cost basis upon the discharge of an indebtedness, nor do we find such a requirement elsewhere in the Code or the regulations. However, respondent in his brief, citing cases, suggests that prior judicial decisions impose this adjustment upon a taxpayer. We have carefully compared such cases as *Hirsch* v. *Commissioner*, 115 F. 2d 656; *Helvering* v. *Killian Co.*, 128 F. 2d 433; *Charles L. Nutter*, 7 T. C. 480; *Ahrens Publishing Co.*, 1 T. C. 345, and others cited by respondent with the present situation, and found them all distinguishable and inapposite here.

In the *Hirsch* and *Killian* cases the taxpayers had purchased certain real estate in a prior year by paying part of the consideration in cash and by either giving or assuming a mortgage for the balance. In both cases the value of the particular real estate involved had depreciated until in the taxable year the fair market value was less than the respective mortgage indebtedness. In both cases the taxpayers offered to convey the real estate to the mortgagee in full satisfaction of the debt, and in both cases the mortgagee refused, but agreed to take a lesser sum in satisfaction of the debt. In both cases it was held that such reduction of the mortgage indebtedness did not constitute taxable income to the particular taxpayer there involved, but rather went to reduce the basis of the property purchased.

The *Hirsch* and *Killian* cases can be distinguished from the present case. Both of those cases involve purchase money mortgages, and a reduction of obligation occasioned by a corresponding decline in value of the property which gave rise to the obligation. Further, a transfer of the real property while the mortgage was in effect would require some disposition of the encumbering mortgage. The present case involves neither a mortgage nor real property; the value of the stock and the value of the obligation are unrelated. Unlike the real property, the stock in the hands of the petitioner could be sold without an encumbrance.

In the *Nutter* case the basic facts are similar to the present case. However, in the *Nutter* case the taxpayer compromised his indebtedness by paying cash and assigning over to the pledgee all the securities held as collateral. The issue from this transaction was whether the compromise resulted in a capital gain or a capital loss to the taxpayer. The issue and the method of compromise distinguish the *Nutter* case from the case before us.

In the *Ahrens* case the taxpayer purchased stock on credit. Later the value of the stock depreciated. The balance of the original purchase price was compromised and settled for less than the balance due. The issue was whether the taxpayer realized income in the amount of the indebtedness canceled. Again this is a case vastly different from the one before us. In the *Ahrens* case the vendor was also the creditor, whereas in the present case the vendor and the creditor are separate and distinct. There the issue was one of income, here one of basis.

When the petitioner secured the loans from the banks, he executed two notes and deposited his own stock as collateral. Respondent contends that this transaction was in the nature of a purchase money mortgage. However, the record proves that it was in fact a pledge. In New York the general rule is that title remains in the pledgor and that the pledgee has only a special property which in substance is no more than the power to sell upon default. *City Bank Farmers Trust Co.* v. *Bowers*, 68 F. 2d 909; *First Trust & Deposit Co.* v. *Potter*, 278 N. Y. S. 847. Since petitioner contracted for the stock, since he was billed for the stock, and since he was able to use the stock as collateral for his loans, he must have held title to the stock at the time of execution of the notes. There is nothing in the record to indicate that he acquired title to the stock by virtue of executing the notes. Then he only acquired money. We think that it would be factitious to say that the cost of his stock, that is the basis of his title, was reduced by a subsequent and totally unrelated cancelation of an indebtedness. We say subsequent because the cancelation was thirteen years after the original sale; totally unrelated because creditors, unrelated to the vendor, canceled petitioner's unsecured notes.

Upon payment of the notes, or upon substitution of other security for the Valvoline Oil Company stock, petitioner was free to use the stock without encumbrances. For example, while the debt was still outstanding in 1937, petitioner could have substituted other security for the Valvoline stock. He then could have sold the Valvoline stock free and clear of any indebtedness. If he had sold the stock in 1937, the only possible basis for computation of gain or loss would have been his cost basis—the amount he paid for the stock in 1930. No statutory law or case law of the land would require the petitioner to wait until the notes were discharged—either by payment or forgiveness of the indebtedness—to determine basis of the stock and then report the gain or loss. This indebtedness and the stock transactions were separate and distinct. They are not interdependent one upon the other.

Except as to sequence of events, we can see no distinction between our hypothetical situation set out above and the situation as presented in this case. Petitioner, between 1930 and 1942, either paid on the

notes and withdrew his Valvoline stock, or he substituted other security for the Valvoline stock so that by the end of 1942 he held in his own hands 25,433 shares of the original purchase. Approximately a year later the notes were discharged; 7 months later petitioner sold 31,329 shares of Valvoline stock, including 25,433 shares of his original purchase. On these facts we can not hold that the transaction on the notes would require an adjustment to the original cost basis of the Valvoline stock.

In making this decision we have been guided by *Astoria Marine Construction Co.,* 12 T. C. 798. In the *Astoria* case the taxpayer suggested that a cancelation of an indebtedness be used to offset a loss on a separate transaction. We held that the compromise of an indebtedness could not be used in that manner. See also *Denman Tire & Rubber Co.,* 14 T. C. 706.

Because there were certain uncontested adjustments in the deficiency notice, a Rule 50 computation will be necessary.

Reviewed by the Court.

*Decision will be entered under Rule 50.*

KERN and RAUM, *JJ.,* concur in the result.