T.C. Memo. 2013-249

UNITED STATES TAX COURT

JOHN D. MOORE AND JULIA A. SMITH, f.k.a. JULIA A. MOORE, Petitioners
<u>v</u>. COMMISSIONER OF INTERNAL REVENUE, Respondent

Docket No. 6417-11.　　　　　　　　　Filed October 30, 2013.

<u>Norman Arthur Lofgren</u> and <u>David C. Gair</u>, for petitioners.

<u>Garrett D. Gregory</u>, for respondent.

MEMORANDUM FINDINGS OF FACT AND OPINION

THORNTON, <u>Chief Judge</u>:  Respondent determined a $746,984 deficiency
in petitioners' 2005 Federal income tax and a section 6662(a) penalty of

[*2] $149,397.[1]  After the parties' concessions, the issues for decision are:  (1) whether petitioners are entitled to a greater adjusted basis in their American TruckSource, Inc. (ATS) stock than respondent has allowed, and (2) whether they are liable for the section 6662(a) accuracy-related penalty.[2]

## FINDINGS OF FACT

The parties have stipulated some facts, which we find accordingly, except as otherwise noted.  When they petitioned the Court, petitioners resided in Texas.

Background

Early in his career, Mr. Moore worked as a certified public accountant focusing mainly on audit and litigation support.  In 1992 he became operations general manager of Dallas Peterbilt, Inc. (Dallas Peterbilt), a subchapter S corporation that sold large trucks and provided service facilities for them.  At that time, Dallas Peterbilt was owned entirely by Jesse Kirk and his family.  In 1995 Mr. Moore became president of Dallas Peterbilt.

---

[1]All section references are to the Internal Revenue Code in effect for 2005, and all Rule references are to the Tax Court Rules of Practice and Procedure.  All monetary amounts are rounded to the nearest dollar.

[2]Petitioners concede that their 2005 taxable income should be increased by $1,477,376 to reflect dividends they received from ATS.  Respondent concedes that petitioners are not liable for the sec. 6662(a) penalty with respect to this dividend income.

[*3] <u>Mr. Moore's Exercise of Purchase Option for ATS Stock</u>

By letter dated December 15, 1992, Jesse Kirk offered Mr. Moore an option, good until December 31, 1999, to purchase 5% of his family's interest in Dallas Peterbilt or its successors (5% option).  In 1999 Mr. Moore exercised this option to purchase from Mr. Kirk 500,000 class A common stock shares of Dallas Peterbilt's successor, ATS, for $212,334.[3]

<u>Mr. Moore's Purchase of ATS Stock From Mr. Baker</u>

In the meantime, in 1997 ATS had merged with Baker Nashville Partnership, the two partners of which were Gary T. Baker and Phil Garrott.  After the merger Mr. Baker redeemed Mr. Garrott's interest, ending up with 1,477,859 shares of ATS class A common stock.  On December 30, 1999, Mr. Moore entered into an agreement to purchase all of these shares from Mr. Baker for $5,842,606.

As part of this transaction, Mr. Moore executed in favor of Mr. Baker a recourse promissory note dated December 31, 1999, for $5,842,606, due and payable with interest on May 5, 2000.  Before any payments had been made on this promissory note, Mr. Moore and Mr. Baker revised the terms of the purchase,

---

[3]In 1997 Dallas Peterbilt had changed its name to Truck Centers of America and later changed its name to American Truck Source, Inc.  For convenience, subsequent references to ATS will include, as appropriate, Dallas Peterbilt and Truck Centers of America.

**[\*4]** agreeing that Mr. Moore would pay Mr. Baker $3 million on June 14, 2000, and would pay the balance of the purchase price in three annual installments of $1,009,367 each. Mr. Moore's obligation to make these installment payments was memorialized in a new recourse promissory note, executed June 14, 2000, for $3,028,101 (3 x $1,009,367) (renewed promissory note).[4]

Payments to Mr. Baker and the ATS Lawsuit

To make the $3 million initial payment as required under the revised purchase agreement, Mr. Moore arranged to have ATS wire $3 million from its bank account to Mr. Baker on June 14, 2000. In partial payment of principal and interest due under the renewed promissory note, between October 2000 and June 2002 ATS issued checks to Mr. Baker totaling $2,353,624. ATS treated both the initial $3 million payment and the subsequent payments to Mr. Baker as advances to Mr. Moore pursuant to a preexisting loan agreement.[5]

---

[4]The parties stipulated that the face amount of the renewed promissory note was $3,082,101. The evidence shows, however, that the face amount of this promissory note was $3,028,101. We disregard the parties' stipulation in this regard as clearly contrary to the facts disclosed by the record. See Cal-Maine Foods, Inc. v. Commissioner, 93 T.C. 181, 195 (1989); Jasionowski v. Commissioner, 66 T.C. 312, 317-318 (1976).

[5]Petitioners characterize this loan agreement as an "unsecured revolving line of credit" and assert that it is evidenced by a promissory note dated August 10, 2000, from Mr. Moore to ATS in the principal amount of $4 million "or so much

(continued...)

**[*5]** Sometime after June 2002 Mr. Moore sued ATS in the District Court of Dallas County, Texas, seeking rescission of his "loan agreement" with ATS because of a mutual mistake as to the value of the ATS shares purchased from Mr. Baker. Mr. Moore's petition alleged that he had entered into the stock purchase agreement with Mr. Baker at the request of ATS and stated: "Defendant [ATS] wanted the Shares to be owned by a 'friendly' party and therefore asked Plaintiff [Mr. Moore] as a convenience to Defendant to enter into the SPA [stock purchase agreement] and purchase the Shares from Baker." The petition further stated that Mr. Moore had agreed to the purchase price of Mr. Baker's shares on the basis of information that ATS had provided Mr. Moore and a promise that ATS would lend him the funds for the purchase price. The petition further asserted that after entering into this agreement Mr. Moore had discovered that the ATS shares had been overvalued and that if he had known the true value of Mr. Baker's shares he would not have entered into the loan agreement with ATS or the stock purchase agreement with Mr. Baker. The petition asserted that as of the date of the petition ATS had advanced Mr. Moore over $4,900,000, which he had paid to Mr. Baker

---

[5](...continued)
thereof as may be advanced from time to time". According to petitioners' records, from about July 2001 until the end of 2002 the balance Mr. Moore owed on this "line of credit" significantly exceeded the $4 million credit limit indicated by this promissory note.

[*6] pursuant to the stock purchase agreement; that Mr. Moore had repaid none of these advances; and that Mr. Baker was still owed over $1 million pursuant to the stock purchase agreement.

The ATS litigation was concluded on December 31, 2002, when the Texas trial court entered an "Agreed Judgment" (hereinafter referred to as the agreed judgment). The agreed judgment stated that ATS had advanced Mr. Moore $5,357,582;[6] that Mr. Moore owed ATS $571,706 of accrued interest with respect to these advances; that Mr. Moore had repaid no portion of his debt to ATS; and that $1 million of Mr. Moore's debt to Mr. Baker under the renewed promissory note remained unpaid. The agreed judgment further stated that the "true economic value" of the ATS shares on December 31, 1999, was $1 million. The agreed judgment required ATS to advance Mr. Moore the remaining amounts due on the Baker note and stated that "to reflect the true economic value of the Shares" the principal amount of the ATS loan to Mr. Moore would be reduced to $1 million, with interest to run on this amount from June 14, 2000 (the date of ATS' initial advance to Mr. Moore with respect to the stock purchase transaction).

By a bookkeeping entry dated December 31, 2002, pursuant to the agreed judgment ATS reduced the balance owing on Mr. Moore's line of credit by

---

[6]We are unable to replicate this number from the evidence before us.

[*7] $5,357,582 (the amount that, according to the agreed judgment, ATS had advanced Mr. Moore with respect to the ATS stock purchase). By a separate bookkeeping entry also dated December 31, 2002, ATS increased the balance owing on Mr. Moore's line of credit by $1 million (the amount that, pursuant to the agreed judgment, Mr. Moore owed ATS with respect to the ATS stock purchase).

By checks dated June 12 and July 14, 2003, ATS paid to Mr. Baker $544,628 and $501,277, respectively, in satisfaction of all remaining principal and interest owed under the renewed promissory note.[7]

In 2005 Mr. Moore sold all of his ATS shares for $3 million.

Petitioners' Tax Reporting

The accounting firm BDO Seidman prepared petitioners' 2002 through 2005 Federal income tax returns. Petitioners' main contact there was a certified public accountant, Catherine Fox, who was familiar with all the facts regarding Mr. Moore's purchase and sale of his ATS shares.[8]

_____

[7]Mr. Moore testified that after the relevant transactions in 2005 he fully repaid ATS all amounts due under his "line of credit". The documentary evidence that petitioners introduced, however, is inconclusive in this regard.

[8]Catherine Fox also represented petitioners in an Internal Revenue Service (IRS) examination relating to their 2002 tax year. As part of that examination, the

(continued...)

[*8]    On Schedule D, Capital Gains and Losses, of their 2005 joint Federal income tax return petitioners reported a capital loss of $1,502,519 from Mr. Moore's sale of the ATS stock.  In calculating the capital loss, petitioners reported a basis of $4,502,519 in the ATS shares.[9]

Notice of Deficiency

In the notice of deficiency respondent determined that petitioners had a long-term capital gain of $2 million from the sale of Mr. Moore's ATS stock.  By way of explanation, the notice of deficiency stated only that the ATS stock basis was "overstated" and that respondent had increased petitioners' capital gain accordingly.

OPINION

I.  Burden of Proof

As a general rule, the Commissioner's determination of a taxpayer's liability is presumed correct, and the taxpayer bears the burden of proving that the

---

[8](...continued)
IRS considered the tax consequences of the agreed judgment.  The IRS Appeals Division settled this matter on the basis that, because the amount of Mr. Moore's debt to ATS was disputed, petitioners' 2002 taxable income did not include cancellation of indebtedness income as a result of the agreed judgment.

[9]This amount reflected reductions to basis from the application of subch. S shareholder basis rules but no reduction to basis as a consequence of the resolution of Mr. Moore's lawsuit against ATS.

**[*9]** determination is improper.  <u>See</u> Rule 142(a); <u>Welch v. Helvering</u>, 290 U.S. 111, 115 (1933).  Pursuant to section 7491(a), however, the burden of proof as to factual issues that are relevant to ascertaining the taxpayer's tax liability may be shifted to the Commissioner where the taxpayer introduces "credible evidence" with respect to those issues.  As discussed below, we decide the issues discussed in this opinion on a preponderance of the evidence and not by reference to the placement of the burden of proof.  Consequently, we need not decide whether pursuant to section 7491(a) the burden of proof should shift to respondent.  <u>See</u> <u>Martin Ice Cream Co. v. Commissioner</u>, 110 T.C. 189, 210 n.16 (1998).

II.  <u>Mr. Moore's Basis in ATS Stock</u>

The primary issue for decision is the amount of petitioners' adjusted basis in the ATS stock that Mr. Moore sold in 2005.

A.  <u>General Rules</u>

Gain or loss from the sale or other disposition of property reflects the difference between the amount realized and the property's adjusted basis.  <u>See</u> sec. 1001(a).  Adjusted basis is generally basis determined under section 1012, adjusted as determined under section 1016.  Sec. 1011.  Under section 1012, basis is generally the property's cost.  In the case of stock in an S corporation,

**[\*10]** adjustments to basis include adjustments required under section 1367.[10]  Sec. 1016(a)(17).

On brief the parties focus on Mr. Moore's basis in his ATS stock without regard to adjustments required under section 1367, which they suggest they will be able to calculate as part of the Rule 155 computations.  Consequently, for present purposes we focus on the basis of Mr. Moore's ATS stock without regard to any adjustments under section 1367.[11]

"Cost" is any "amount paid for such property in cash or other property".  Sec. 1.1012-1(a), Income Tax Regs.  Cost generally includes promissory notes issued in exchange for property.  Commissioner v. Tufts, 461 U.S. 300, 307-308 (1983); Crane v. Commissioner, 331 U.S. 1 (1947); see sec. 1.1012-1(g), Income Tax Regs.  Although cost basis generally equals the price paid for property, irrespective of its actual value, this rule might not apply "'where a transaction is based upon 'peculiar circumstances' which influence the purchaser to agree to a price in excess of the property's fair market value.'"  Lemmen v. Commissioner,

---

[10]Generally, a shareholder's adjusted basis in S corporation stock is increased for items of income passed through to the shareholder under sec. 1366(a)(1) and decreased (but not below zero) by losses and deductions passed through to the shareholder under sec. 1366(a)(1).  Sec. 1367(a).

[11]If the parties are unable to agree about these adjustments, we may address this issue in a Rule 155(b) proceeding.

**[*11]** 77 T.C. 1326, 1348 (1981) (holding that a taxpayer's basis in a cattle herd was limited to its fair market value at the time of purchase where excess purchase price was allocable to maintenance contracts) (quoting Bixby v. Commissioner, 58 T.C. 757, 776 (1972)).

### B. The Parties' Contentions

Petitioners assert that Mr. Moore's cost basis in his ATS shares was $6,054,940, representing (1) the $212,334 that he paid in exercising his option to purchase 5% of the Kirk family's interest, plus (2) the $5,842,606 that petitioners say represent the total payments that Mr. Moore made pursuant to his 1999 agreement to purchase Mr. Baker's 1,477,859 shares.

Respondent contends that Mr. Moore's cost basis in the ATS shares was only $1 million because, as a result of the agreed judgment, his ultimate cost and economic outlay for the ATS shares was only $1 million. Respondent cites Arrowsmith v. Commissioner, 344 U.S. 6 (1952), to invoke a "relation-back doctrine" that, according to respondent, would require correlating Mr. Moore's original purchase of ATS stock from Mr. Baker with the agreed judgment that limited to $1 million the principal amount of Mr. Moore's obligation to ATS with respect to Mr. Moore's purchase of Mr. Baker's ATS shares. Respondent also

[*12] contends that the lawsuit resulted in a return of Mr. Moore's capital with respect to these shares that lowered his basis to $1 million.

### C. Basis in the ATS Stock Acquired Pursuant to the 5% Option

Respondent's contentions seem to overlook the ATS stock that Mr. Moore acquired by exercising the 5% option. Neither in the notice of deficiency nor in this proceeding has respondent accounted for the $212,334 that Mr. Moore paid for the ATS shares he acquired from Jesse Kirk pursuant to the 5% option. Respondent has advanced no reason this $212,334 should not be included in Mr. Moore's basis. In any event, we have found as a fact that Mr. Moore paid $212,334 for the ATS shares purchased pursuant to the 5% option, and we hold that this amount should be included in his cost basis.

### D. Basis in the ATS Stock Acquired From Mr. Baker

#### 1. Has Respondent Improperly Raised New Matters?

Petitioners contend that respondent's "relation back" and "return of capital" arguments, as related to the ATS shares acquired from Mr. Baker, are new matters that respondent has improperly raised for the first time on brief. They note that the notice of deficiency stated merely that the basis of the ATS shares was "overstated", that respondent raised his "return of capital" theory only shortly before trial, and that he raised his "relation back" theory only in his posttrial brief.

**[\*13]** They contend that respondent's "wholesale changes" to his theories constitute "new matters" that are not properly before the Court or alternatively that the burden of proof with respect to any factual issues related to these new legal theories should be shifted to respondent.

Contrary to petitioners' contentions, respondent's legal theories merely clarify and develop his determination in the notice of deficiency and do not constitute new matters.  See Shea v. Commissioner, 112 T.C. 183, 201 (1999) (discussing differing effects of relying on a new theory and raising a new matter); Ware v. Commissioner, 92 T.C. 1267 (1989), aff'd, 906 F.2d 62 (2d Cir. 1990); Achiro v. Commissioner, 77 T.C. 881, 889-890 (1981).  Although it is most appropriate for the Commissioner to assert his legal theories in the notice of deficiency, the answer, or his amended answer, the Commissioner is not necessarily barred from relying on new legal theories advanced later during the pendency of the proceedings.  See Stewart v. Commissioner, 714 F.2d 977, 986 (9th Cir. 1983), aff'g T.C. Memo. 1982-209; Dirico v. Commissioner, 139 T.C. 396, 415-417 (2012); Ware v. Commissioner, 92 T.C. at 1269.  Moreover, this Court has inherent authority to decide cases on grounds not raised in the notice of deficiency.  Seligman v. Commissioner, 84 T.C. 191, 198 (1985), aff'd, 796 F.2d 116 (5th Cir. 1986).  In either instance, the critical consideration is whether the

[*14] taxpayer would suffer unfair surprise or disadvantage.  See Dirico v.

Commissioner, 139 T.C. at 416; Ware v. Commissioner, 92 T.C. at 1268;

Seligman v. Commissioner, 84 T.C. at 198.

We are not convinced that petitioners will suffer any unfair surprise or

disadvantage from our consideration of respondent's legal theories or from our

application of the law to the facts established by the record.  On brief petitioners

contend that if they had known that respondent intended to rely on his current

theories they would have introduced additional evidence at trial, namely testimony

and documentation with respect to petitioners' and ATS' 2002 tax year

examination.[12]  For reasons discussed in more detail below, however, we are not

persuaded that additional evidence relating to their or ATS' 2002 tax years would

help their case.  Petitioners have not adequately explained what other relevant

evidence, if any, they might have wished to have introduced.  In any event,

respondent discussed his return of capital theory in his pretrial memorandum filed

---

[12]Before trial petitioners subpoenaed two of respondent's revenue agents involved in the 2002 examination of petitioners' and ATS' tax returns. Respondent moved to quash both subpoenas.  At a hearing on respondent's motion to quash, petitioners' counsel stated that petitioners sought to introduce testimony from both agents with respect to "their professional interface with accountants from BDO Seidman who represented Mr. Moore" as part of their defense to the accuracy-related penalty.  We granted respondent's motion to quash because petitioners' proffered evidence was a mixture of improper opinion testimony and hearsay that was immaterial to the resolution of the issues before the Court.

**[*15]** about two weeks before trial.  See <u>Wilson v. Commissioner</u>, T.C. Memo. 2002-61 (finding no prejudice or disadvantage to taxpayers where the Commissioner discusses new legal theories in his pretrial memorandum), <u>aff'd</u>, 71 Fed. Appx. 623 (9th Cir. 2003); <u>Schaefer v. Commissioner</u>, T.C. Memo. 1992-205 (same).  His so-called relation back theory merely supports or amplifies those arguments.  Accordingly, respondent is not barred from asserting these legal theories.  In any event, we base our analysis on the record presented rather than on placement of the burden of proof.

### 2. Should Petitioners' ATS Basis Be Reduced on Account of the Agreed Judgment?

Respondent contends that petitioners' ATS basis should be reduced on account of the agreed judgment because Mr. Moore's agreement to purchase Mr. Baker's ATS shares was integrally related to the loan from ATS to pay for these shares and the agreed judgment that relieved him of all but $1 million of the principal amount of that loan.  Petitioners counter that respondent's legal theories "incorrectly ignore the separateness of the two transactions and further incorrectly treat the purchase from [Mr. Baker] and loan from ATS as one unified transaction."  Petitioners contend that we should respect as two separate transactions Mr.

[*16] Moore's purchase of the ATS stock from Mr. Baker for $5,842,606 and Mr. Moore's separate loan arrangement with ATS to pay for these shares.

The recourse note that Mr. Moore gave Mr. Baker may have reflected a legally binding debtor-creditor relationship that, without more, would properly have been reflected in petitioners' basis.[13] But the real import of the transaction must be determined "not by subtleties of draftsmanship but by their total effect." Commissioner v. P.G. Lake, Inc., 356 U.S. 260, 266-267 (1958). When a transaction is structured so that, taking economic realities into account, there is no realistic expectation that the taxpayer will repay the entire nominal debt, the amount recognized as actual debt should be limited accordingly. See Bridges v. Commissioner, 39 T.C. 1064, 1077 (1963) ("While it is true that technically petitioner was personally obligated on his note * * * there was no reason to think that petitioner could or would have been called upon to pay the note out of his own funds[.]"), aff'd, 325 F.2d 180 (4th Cir. 1963); Roe v. Commissioner, T.C. Memo.

---

[13]Respondent has not argued that Mr. Moore's promissory note to Mr. Baker was, or should be treated as, nonrecourse debt. Cf. Estate of Franklin v. Commissioner, 64 T.C. 752 (1975) (nonrecourse debt used to acquire property was not true indebtedness to the extent it exceeded the property's fair market value), aff'd, 544 F.2d 1045, 1049 (9th Cir. 1976); Bergstrom v. United States, 37 Fed. Cl. 164, 168-169 (1996) ("[W]hen the debt is nonrecourse in nature and exceeds a reasonable estimate of fair market value, the majority rule is that the entire debt is disregarded from basis.").

**[\*17]** 1986-510 (discussing cases in which recourse notes have been held not to be genuine indebtedness for purposes of determining basis in acquired property), aff'd without published opinion sub nom. Haag v. Commissioner, 855 F.2d 855 (8th Cir. 1988), and aff'd without published opinion sub nom. Sincleair v. Commissioner, 841 F.2d 394 (5th Cir. 1988).

The economic reality of the transactions in question, viewed in their totality, was that Mr. Moore agreed to purchase Mr. Baker's ATS shares as an accommodation to ATS, with an understanding that ATS' funds would be used to pay the nominal purchase price. According to Mr. Moore's own allegations in his subsequent lawsuit against ATS, there was no expectation that he should pay out of his own funds more than the true economic value of the shares, which both he and ATS ultimately agreed was only $1 million.[14] In the final analysis Mr. Moore

---

[14]According to Mr. Moore's allegations, he entered into the stock purchase agreement with Mr. Baker at ATS' request and agreed to the purchase price on the basis of information that ATS had provided him and a promise that ATS would lend him the funds for the purchase price. His lawsuit was predicated upon his and ATS' mutual mistake as to the value of the ATS stock at the time of the purchase. He sought rescission of the loan agreement, claiming that he would suffer irreparable harm by owing ATS an "excessive amount of money for an investment worth far less than the amount owed". Pursuant to the agreed judgment, both parties agreed that when Mr. Moore purchased the ATS shares from Mr. Baker and agreed to the ATS loan, he believed "that the value of the [ATS] Shares was equal to the [p]urchase [p]rice when in fact the value of the [ATS] Shares was substantially less than the [p]urchase [p]rice". The parties also

(continued...)

[*18] neither paid, nor was he obligated to pay, more than $1 million for Mr.

Baker's ATS shares. In these circumstances, we agree with respondent that Mr.

Moore's cost basis in these shares was $1 million.

This conclusion is consistent with Allen v. Courts, 127 F.2d 127 (5th Cir.

1942), a decision by the Court of Appeals for the Fifth Circuit, to which any appeal

of this case would ordinarily lie. See sec. 7482(b)(1)(A). In that case, the taxpayer

borrowed $402,000 from a third party to purchase a seat on the New York Stock

Exchange. The lender agreed not to maintain suit against the taxpayer to collect

the debt so long as the taxpayer remained a member of the stock exchange; the

lender also agreed to subordinate his claims to other debts the taxpayer might incur

in transacting business while a member of the stock exchange. Several years after

the original loan, and before the taxpayer had repaid any of it, the taxpayer and the

lender agreed to settle the debt for $213,625. The Court held that the taxpayer had

no gain on the compromise of the debt but rather the taxpayer's basis in the seat

was reduced to the compromised amount. In reaching this result, the Court

observed that the taxpayer "never had control of the borrowed money, but it was

---

[14](...continued)
agreed that the "true economic value" of the ATS shares on December 31, 1999, was $1 million. The agreed judgment reduced the principal amount of Mr. Moore's obligation to the ATS loan to $1 million.

[*19] expressly loaned to buy a seat on the Exchange for $402,000, and he could do nothing else with it.  It was in effect as though * * * [the lender] had sold him the seat." Courts, 127 F.2d at 128.  In addition, the Court noted, because of restrictions on the lender's right to collect, the debt was not "absolute". Id. "Looking at the whole transaction, as was done in Bowers v. Kerbaugh-Empire Co., 271 U.S. 170 [1926]", the Court concluded that the "substance of this transaction is that * * * [the taxpayer] bought a seat on the Exchange * * * for which he gave an obligation of $402,000 nominally, but which fell far short of being an absolute one, and which had really a much less exchangeable value." Id.

Similarly, ATS lent Mr. Moore the funds for the stock purchase but paid Mr. Baker directly; Mr. Moore could do nothing else with those funds.  And given that (according to Mr. Moore's allegations in his lawsuit) ATS requested him to purchase Mr. Baker's shares in the first instance, the court's reasoning in Courts about the transactional substance applies with even greater force here--"[i]t was in effect as though" ATS acquired Mr. Baker's ATS shares and sold them to Mr. Moore. Id.  Moreover, the non-arm's-length nature of the loan agreement between Mr. Moore and ATS, and the manner in which they dealt with it, strongly suggest that it did not represent absolute indebtedness.  More specifically, for a long time Mr. Moore's outstanding balance on his ATS loan significantly exceeded the $4

**[*20]** million credit limit indicated by the promissory note that petitioners say evidenced his ATS line of credit. Moreover, at the time of the agreed judgment, Mr. Moore had repaid ATS none of the money that ATS had lent him to purchase the shares from Mr. Baker some 18 months earlier.[15] Looking at the transaction as a whole, we are left with the firm conviction that Mr. Moore's loan arrangement with ATS, similar to the loan arrangement in Courts, fell far short of absolute indebtedness and that the actual effect of the agreed judgment was to reduce the purchase price of the ATS shares that Mr. Moore acquired from Mr. Baker. See also Commissioner v. Sherman, 135 F.2d 68, 70 (6th Cir. 1943) (holding that discharge of debt by third-party lender to purchaser of property resulted in a reduction of purchase price), aff'g 44 B.T.A. 853 (1941).

In this regard, petitioners' reliance on Edwards v. Commissioner, 19 T.C. 275 (1952), is misplaced. The issue in Edwards was whether a taxpayer who acquired stock through bank loans had to reduce his stock basis in those shares when he was relieved of these loans 13 years later.[16] In Edwards, however, unlike

---

[15]Although respondent does not appear to dispute that Mr. Moore eventually paid ATS the $1 million debt that remained after the agreed judgment, the record does not clearly indicate how or when this payment was made.

[16]In Edwards v. Commissioner, 19 T.C. 275 (1952), the taxpayer purchased 32,228 shares of Valvoline Oil Co. stock (Valvoline stock). See id. at 275-276. In

(continued...)

**[\*21]** the instant case, the "value of the stock and the value of the obligation \* \* \* [were] unrelated", id. at 280, as were the creditor and the vendor.

Petitioners also point to the fact that the IRS' examination of their 2002 tax return resulted in a determination that the agreed judgment did not give rise to cancellation of indebtedness income for them because the amount of the debt was in dispute. This circumstance, however, supports rather than undermines our conclusions. The determination that petitioners had no cancellation of indebtedness income for 2002 is consistent with our view that Mr. Moore's original debt to ATS was not absolute and that the actual amount of the debt was the $1 million ultimately reflected in the agreed judgment. To permit petitioners a basis in the ATS stock reflecting the nominal purchase price of the stock acquired from Mr.

---

[16](...continued)
order to facilitate this purchase, he borrowed $3 million from each of two banks. Id. at 276. Both debts were evidenced by collateral loan notes and secured by stock the taxpayer had owned previously as well as the Valvoline stock he had recently purchased. Id. For the duration of the loans, both banks permitted the taxpayer to substitute other collateral in exchange for the release of his Valvoline shares, and he did in fact substitute other collateral for some of his Valvoline shares. Id. at 276-277. Over a decade after purchasing the Valvoline stock, the taxpayer became insolvent, and both banks sold some of the collateralized stock to satisfy his debts. Id. The collateralized stock remaining was not sufficient, however, to satisfy his remaining outstanding debts to the banks. Id. at 277. In total, the taxpayer owed approximately $4 million to the banks, but as a result of negotiations he was able to cancel each debt for payments to each bank totaling $50,000. Id. This Court held that the taxpayer's basis was not reduced by the debt forgiven by the two banks. Id. at 282.

[*22] Baker without realizing any cancellation of indebtedness income as a result of the agreed judgment would result in an unjustified tax windfall to petitioners. By contrast, the result we reach today affords symmetry to the tax consequences of the agreed judgment for petitioners' 2002 and 2005 tax years.[17]

In sum, on the unique facts of this case we conclude that Mr. Moore's cost basis in his ATS stock must be reduced to account for the agreed judgment. We hold that as of the date of the sale of his ATS stock, his cost basis was $1,212,334, representing the $1 million debt fixed by the agreed judgment on the basis of the shares' true value and the $212,334 Mr. Moore paid in exercising the 5% option from Jesse Kirk.

## III. Accuracy-Related Penalty

Respondent determined that petitioners are liable for an accuracy-related penalty pursuant to section 6662(a) and (b)(1) and (2) for negligence or a substantial understatement of income tax. Respondent bears the burden of

---

[17]Petitioners also argue on brief that it is unfair to reduce their basis in their ATS shares because pursuant to sec. 1367 their basis has already been reduced by a distributive share of the loss ATS purportedly suffered in 2002 as a result of the agreed judgment. The short answer to petitioners' argument is that determination of cost basis under sec. 1012 is independent of the adjustments required under sec. 1016, including adjustments required under sec. 1367, to arrive at adjusted basis. The statutory scheme does not allow for increased cost basis under sec. 1012 to counteract the effects of adjustments under sec. 1016.

**[*23]** production with respect to this penalty.  <u>See</u> sec. 7491(c).  To meet this burden, respondent must produce evidence establishing that it is appropriate to impose this penalty.  Once respondent has done so, the burden of proof is on petitioners to show that the penalty does not apply.  <u>See</u> Rule 142(a); <u>Higbee v. Commissioner</u>, 116 T.C. 438, 446-447 (2001).

Section 6662(a) and (b)(2) imposes a 20% accuracy-related penalty on any portion of a tax underpayment that is attributable to, among other things, any substantial understatement of income tax, defined in section 6662(d)(1)(A) as an understatement that exceeds the greater of 10% of the tax required to be shown on the return or $5,000.  Sec. 6662(d)(1).  Although the exact amount of petitioners' understatement will depend on the parties' Rule 155 computations, it seems almost certain that those computations will establish that petitioners had a substantial understatement of income tax so as to meet respondent's burden of production.  See <u>Prince v. Commissioner</u>, T.C. Memo. 2003-247.  Accordingly, we need not decide whether respondent has also met his burden of production as to negligence.

The accuracy-related penalty does not apply with respect to any portion of the underpayment if it is shown that the taxpayer had reasonable cause and acted in good faith.  Sec. 6664(c)(1).  Whether a taxpayer acted with good faith depends upon the facts and circumstances of each case.  Sec. 1.6664-4(b)(1), Income Tax

**[\*24]** Regs. Petitioners contend they had reasonable cause and acted in good faith in relying on advice from their advisers at BDO Seidman who prepared their income tax return for 2005 as well as earlier years.

Reliance on a professional tax adviser's advice may demonstrate reasonable cause and good faith if, taking into account all the facts and circumstances, the reliance was reasonable and the taxpayer acted in good faith. Sec. 1.6664-4(b)(1), (c)(1), Income Tax Regs. Reliance on a tax adviser may be reasonable and in good faith if the taxpayer establishes: (1) the adviser was a competent professional with sufficient expertise to justify reliance; (2) the taxpayer provided necessary and accurate information; and (3) the taxpayer actually relied in good faith on the adviser's judgment. Neonatology Assocs., P.A. v. Commissioner, 115 T.C. 43, 99 (2000), aff'd, 299 F.3d 221 (3d Cir. 2002).

Respondent does not appear to dispute that petitioners' tax advisers at BDO Seidman were competent professionals with sufficient expertise to justify reliance. Mr. Moore's credible testimony and the documentary evidence show that these advisers were fully aware of all the facts relating to the transactions in question. We find that petitioners sought and in good faith relied on the tax advice of professional tax advisers. Taking into account all the facts and circumstances, we conclude that petitioners had reasonable cause and acted in good faith in reporting

**[\*25]** their basis in the ATS shares.  Cf. <u>United States v. Boyle</u>, 469 U.S. 241, 251 (1985) ("When an accountant or attorney advises a taxpayer on a matter of tax law, such as whether a liability exists, it is reasonable for the taxpayer to rely on that advice.").  We do not sustain the imposition of the accuracy-related penalty.

To reflect the foregoing and the parties' concessions,

<u>Decision will be entered</u>

<u>under Rule 155</u>.